**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and PETERSON, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**February 23, 2016**

# In the Court of Appeals of Georgia

A15A2351. SEVILLA-CARCAMO v. THE STATE.

DILLARD, Judge.

Katia Sevilla-Carcamo appeals the trial court's denial of her motion to suppress evidence. On appeal, Sevilla-Carcamo contends that the trial court erred when it concluded that (1) the officer had reasonable articulable suspicion to stop her vehicle based on her failure to use a turn signal; (2) in the alternative, the "good faith" exception, or a reasonable mistake of law, gave rise to a reasonable articulable suspicion justifying a stop of her vehicle; and (3) a third party validly consented to a search of the vehicle after she refused to consent. For the reasons set forth *infra*, we affirm.

At the outset, we note that the Supreme Court of Georgia has reiterated three fundamental principles to follow in reviewing a ruling upon a motion to suppress.[1] First, the trial judge sits as the trier of fact at a hearing on a motion to suppress.[2] And because the trial judge hears the evidence, the judge's findings based upon conflicting evidence are "analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support [them]."[3] Second, the trial judge's decision with regard to questions of fact and credibility "must be accepted unless clearly erroneous."[4] Finally, we (as the reviewing court) must construe the evidence "most favorably to the upholding of the trial court's findings and judgment."[5]

So viewed, the record reflects that on the day in question, an officer with the Gwinnett County Police Department received a tip from a Drug Enforcement Administration ("DEA") agent that a white Acura SUV driven by Sevilla-Carcamo

---

[1] *See Miller v. State*, 288 Ga. 286, 286 (1) (702 SE2d 888) (2010).

[2] *Id*.

[3] *Id.* As to this first principle, our Supreme Court has further instructed that, "[t]o properly follow [it], we must focus on the facts found by the trial court in its order." *Id.* at 287 (1) (emphasis omitted).

[4] *Miller*, 288 Ga. at 286 (1).

[5] *Id.*

may contain illegal contraband. The officer then conveyed this information to a second Gwinnett County officer, who then followed the vehicle for some time, looking for justification to initiate a traffic stop.

As the officer followed behind, Sevilla-Carcamo came to an on-ramp for I-85 South and proceeded onto the interstate by merging across a dashed lane line into southbound traffic without utilizing a turn signal. According to the officer, southbound traffic was very heavy at the time, and the lane beside the merge lane contained many vehicles when Sevilla-Carcamo merged without the use of a signal. Additionally, at some point prior to the imminent traffic stop, Sevilla-Carcamo's vehicle traveled, in total, two lanes to the left of the merge lane. Thus, due to Sevilla-Carcamo's failure to utilize a turn signal while changing lanes, the officer initiated a traffic stop, at which point the officer who initially received the DEA tip also arrived on scene.

When the initiating officer approached Sevilla-Carcamo, he requested her driver's license, but she informed him that she did not have one. Sevilla-Carcamo also told the officer that she was en route to pick up a friend's child from a local elementary school, but the officer observed that the school was located eight to ten miles north of the direction she was traveling (which was southbound). At that point,

3

the officer placed Sevilla-Carcamo under arrest for driving without a valid driver's license.

After her arrest, the officers asked Sevilla-Carcamo for consent to search the vehicle, which she declined to give. Then, in accordance with department policy, the officers allowed Sevilla-Carcamo to contact someone to recover the vehicle rather than have it impounded. Sevilla-Carcamo called her pastor and, 20 to 25 minutes later, he arrived on the scene.

Both prior to and concurrent with the pastor's arrival, a K-9 unit conducted two open-air searches of Sevilla-Carcamo's vehicle, but the dog did not alert to the presence of any contraband. Nevertheless, before the pastor could leave with the vehicle, the officers informed him that they suspected the presence of illegal contraband and that he "would be responsible for whatever was in the car if he took possession of the vehicle." The pastor then asked to speak with Sevilla-Carcamo, who was sitting handcuffed in the back of a patrol car.

The conversation that ensued between the pastor and Sevilla-Carcamo was mostly in Spanish, which none of the officers could speak or understand; but at its conclusion, the pastor informed the officers that Sevilla-Carcamo gave him permission to take possession of the vehicle and that she told him that "there may be

4

drugs in the vehicle." The pastor then requested that the officers search the vehicle. But before doing so, one of the officers once again confirmed with Sevilla-Carcamo that she wished for the pastor to take possession of the vehicle, to which she responded in the affirmative.

Having received the pastor's permission to search the vehicle, the officers then proceeded with the search and located in the center console a large white purse containing a kilogram of cocaine. Sevilla-Carcamo was thereafter indicted for trafficking cocaine.[6] She filed a motion to suppress the evidence discovered in her vehicle by law enforcement, which the trial court denied. Sevilla-Carcamo then filed an application for interlocutory appeal, which we granted. This appeal follows.

As set forth *supra*, Sevilla-Carcamo contends that (1) the officer lacked reasonable articulable suspicion to stop her vehicle based on a failure to use a turn signal; (2) the trial court erred in concluding that the "good faith" exception, or a reasonable mistake of law, gave rise to a reasonable articulable suspicion justifying a stop of her vehicle even if the failure to use a turn signal did not; and (3) her pastor's consent to search the vehicle was invalid when she had previously refused consent to search. We will address each of these enumerations of error in turn.

---

[6] *See* OCGA § 16-13-31 (a).

5

1. First, Sevilla-Carcamo argues that the officer lacked reasonable articulable suspicion to justify a stop of her vehicle based upon a failure to use a turn signal. Specifically, she contends that this is so because OCGA § 40-6-123 "contemplates instances in which a turn on a roadway can be made with reasonable safety and without the use of a turn signal." We disagree.

OCGA § 40-6-123 provides that no person shall, *inter alia*, "change lanes or move right or left upon a roadway unless and until such movement can be made with reasonable safety"[7] *and* that "[n]o person shall so turn any vehicle without giving an appropriate and timely signal in the manner provided in this Code section."[8] This statutory provision further directs that "[a] signal of intention to . . . change lanes when required shall be given continuously for a time sufficient to alert the driver of a vehicle proceeding from the rear in the same direction or a driver of a vehicle approaching from the opposite direction."[9]

Sevilla-Carcamo argues that it was not necessary for her to utilize a turn signal while merging onto I-85 because drivers traveling southbound had "already been

---

[7] OCGA § 40-6-123 (a).

[8] *Id.*

[9] OCGA § 40-6-123 (b).

6

notified by a conspicuous merge sign with arrows indicating . . . that vehicles will be merging into their lane of travel, thus obviating the need for southbound merge lane drivers to signal" and because, at the relevant on-ramp, "merge lane drivers have no legal option but to share the same lane [in which] they are already traveling." But we agree with the trial court that because, during a period of heavy traffic, Sevilla-Carcamo failed to use a turn signal when she crossed over a dashed lane line[10] into the lane in which the on-ramp would have *eventually* fully merged, the officer indeed had probable cause to initiate a traffic stop for violating OCGA § 40-6-123.[11]

---

[10] *Cf.* OCGA § 40-6-46 (a) ("[N]o-passing zones shall be clearly marked by a solid barrier line placed on the right-hand element of a combination stripe along the center or lane line or by a solid double yellow line."); OCGA § 40-6-46 (b) ("Where signs or markings are in place to define a no-passing zone . . . , no driver shall at any time drive on the left side of the roadway within such no-passing zone or on the left side of any pavement striping designed to mark such no-passing zone throughout its length.").

[11] *See Morgan v. State*, 309 Ga. App. 740, 745-46 (710 SE2d 922) (2011) (holding that the trial court was "authorized to find that the evidence placed vehicles in close spatial and temporal proximity to the Hyundai when it made its turn such that the officer had probable cause to believe that the driver of the Hyundai had violated OCGA § 40-6-123 by turning without signaling"); *Salinas-Valdez v. State*, 276 Ga. App. 732, 732-33 (1) (624 SE2d 278) (2005) (holding that deputy had a "sufficiently specific basis to justify the initial stop" when driver changed lanes without signaling in "medium heavy to heavy" traffic); *Johnson v. State*, 249 Ga. App. 29, 30 (546 SE2d 922) (2001) (holding that stop of vehicle was authorized when officer observed driver abruptly change lanes without signaling three times when "three or four" other cars were on the roadway). *Cf. State v. Goodman*, 220 Ga. App. 169, 171 (2) (469

7

2. Given our holding in Division 1 *supra*, we need not address Sevilla-Carcamo's second enumeration of error, which is that the trial court erred in finding, in the alternative, that the officer had a good-faith basis to stop her vehicle notwithstanding any mistake of law. However, it is worth noting that this Court has previously held, in the context of a traffic stop for a suspected violation of OCGA § 40-6-123 (a), that "[i]f an officer in good faith believes that an unlawful act has been committed, his actions are not rendered improper by a later determination that the conduct observed was not a crime."[12]

3. Finally, Sevilla-Carcamo contends that her pastor's consent to a search of the vehicle was invalid because she had previously refused to permit a search. Yet again, we disagree.

---

SE2d 327) (1996) (holding that driver's legal u-turn at intersection from left-turn-only lane without signaling did not justify traffic stop for making improper left turn).

[12] *Parker v. State*, 307 Ga. App. 61, 62 (1) (704 SE2d 438) (2010) (punctuation omitted); *see also Heien v. North Carolina*, __ U.S. __, __ (II) (135 SCt 530, 190 LE2d 475) (2014) (holding that "reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition").

8

It is well established that a valid consent to search "eliminates the need for either probable cause or a search warrant."[13] And in *United States v. Matlock*,[14] the Supreme Court of the United States explained that "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects to be inspected."[15] Nevertheless, at least insofar as consent to search a residence is concerned, in *Georgia v. Randolph*,[16] the Supreme Court of the United States somewhat limited its earlier holding in *Matlock* to specify that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him."[17]

---

[13] *Hardin v. State*, 277 Ga. 242, 244 (3) (587 SE2d 684) (2003) (punctuation omitted); *accord Dean v. State*, 250 Ga. 77, 80 (295 SE2d 306) (1982); *see also United States v. Matlock*, 415 U.S. 164, 165-66 (94 SCt 988, 39 LE2d 242) (1974) (noting that "the search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment").

[14] 415 U.S. 164 (94 SCt 988, 39 LE2d 242) (1974).

[15] *Id.* at 171 (II).

[16] 547 U.S. 103 (126 SCt 1515, 164 LE2d 208) (2005).

[17] *Id.* at 106.

Importantly, in limiting a co-tenant's ability to consent to the search of a residence, the Supreme Court of the United States focused on "societal expectations" and noted that because a "co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all."[18] Thus, the cooperative occupant's invitation "adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place."[19] And the home, of course, is "entitled to special protection as the center of the private lives of our people."[20] Indeed, as the Supreme Court of the United States so eloquently noted in

---

[18] *Id.* at 114 (II) (D).

[19] *Id.* at 115 (II) (D).

[20] *Id.* (punctuation omitted); *see also Wilson v. Layne*, 526 U.S. 603, 610 (II) (119 SCt 1692, 143 LE2d 818) (1999) ("The Fourth Amendment embodies th[e] centuries-old principle of respect for the privacy of the home[.]"); *Welsh v. Wisconsin*, 466 U.S. 740, 748 (II) (104 SCt 2091, 80 LE2d 732) (1984) ("It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (punctuation omitted)); *Miller v. United States*, 357 U.S. 301, 307 (78 SCt 1190, 2 LE2d 1332) (1958) ("The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may

*Kyllo v. United States*,[21] at the "very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."[22]

On the other hand, it is likewise well established that the expectation of privacy with respect to one's automobile is "significantly less than that relating to one's home or office."[23] Indeed, automobiles, unlike homes, are "subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and

---

enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!" (punctuation omitted)).

[21] 533 U.S. 27 (121 SCt 2038, 150 LEd2d 94) (2001)

[22] *Id*. at 31 (II) (Scalia, J.) (punctuation and citation omitted).

[23] *South Dakota v. Opperman*, 428 U.S. 364, 367 (2) (96 SCt 3092, 49 LE2d 1000) (1976); *see also State v. Scott*, 159 Ga. App. 869, 871 (2) (285 SE2d 599) (1981) ("[A] person has less expectation of privacy with respect with one's automobile than one's home or office."); *Cuevas v. State*, 151 Ga. App. 605, 608 (1) (A) (260 SE2d 737) (1979) ("Less stringent requirements govern search of motor vehicles because the expectation of privacy in one's auto is significantly less than in one's home.").

11

licensing requirements."[24] And the expectation of privacy as to automobiles is further diminished by "the obviously public nature of automobile travel."[25]

Here, Sevilla-Carcamo agreed to entrust her vehicle to her pastor for safekeeping, thus creating a bailment.[26] And in doing so, she "assumed the risk that

---

[24] *Opperman*, 428 U.S. at 368 (2); *accord California v. Carney*, 471 U.S. 386, 392 (2) (105 SCt 2066, 85 LE2d 406) (1985); *United States v. Albers*, 136 F3d 670, 673 (9th Cir. 1998); *see also Somesso v. State*, 288 Ga. App. 291, 293-94 (2) (a) (653 SE2d 855) (2007) ("These reduced privacy expectations derive from the pervasive regulation of vehicles capable of traveling on public highways.").

[25] *Opperman*, 428 U.S. at 368 (2); *see Cardwell v. Lewis*, 417 U.S. 583, 590 (II) (94 SCt 2464, 41 LE2d 325) (1974) ("One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view."); *Bain v. State*, 258 Ga. App. 440, 443 (1) (b) (574 SE2d 590) (2002) ("Because of the ready mobility of an automobile and the fact that the expectation of privacy with respect to one's automobile is significantly less than that with respect to one's home or office, the United States Supreme Court has long recognized an exception to the warrant requirement for searching an automobile, if based upon probable cause."); *Stanford v. State*, 251 Ga. App. 87, 89 (1) (553 SE2d 622) (2001) ("The ready mobility of an automobile and the fact that the expectation of privacy with respect to one's automobile [is] significantly less than that relating to one's home or office justify a warrantless search, if based upon probable cause."); *see also Carney*, 471 U.S. at 392-94 (2) (holding that vehicle-exception to warrant requirement applied to mobile home); *Albers*, 136 F3d at 673 (holding that vehicle-exception to warrant requirement applied to houseboat).

[26] *See Wilder v. State*, 290 Ga. 13, 17 (3) & n.4 (717 SE2d 457) (2011) (noting that, "given the undisputed evidence that [defendant] left the briefcase with [a third party] for safekeeping and that [the third party] kept the briefcase at his request, it

[the pastor] would allow someone else to look inside."[27] Thus, the pastor at that point possessed authority to consent to a search of the SUV because there is no evidence that Sevilla-Carcamo in any way limited her pastor's use of the vehicle or ability to

---

appear[ed] that a bailment was created," but declining to address the applicability of the third-party consent doctrine when the third party has assumed the role of bailee). *See generally* WAYNE R. LAFAVE, 4 SEARCH & SEIZURE § 8.6 (a) (5th ed.) (collecting cases and discussing consent to search by bailees).

[27] *Frazier v. Cupp*, 394 U.S. 731, 740 (III) (89 SCt 1420, 22 LE2d 684) (1969); *see Pupo v. State*, 187 Ga. App. 765, 767 (5) (371 SE2d 219) (1988) ("[The appellant's] status as driver of the vehicle afforded him sufficient authority over it to enable him to consent to the search, particularly in the absence of any objection by [the passenger, to whom the vehicle was registered]."); *see also Fears v. State*, 152 Ga. App. 817, 819 (1) (264 SE2d 284) (1979) ("After committing a violent crime, appellant left his bag in a house belonging to another and over which he had no authority or proprietary interests, and no reasonable expectation of privacy generally; the owner knew of or suspected the crime . . . and discovered the weapon. She had a right to have it removed from her house and had the right to permit the police to open the bag to get it out. Moreover, when he left his bag in his sister's house, appellant did not give her any instructions as to what to do with it and cannot object to her permitting its contents to be removed. Appellant's relinquishment of all control over the bag in the house of another was tantamount to an abandonment." (citation omitted)); *United States v. Basinski*, 226 F3d 829, 834 (II) (A) (7th Cir. 2000) (Manion, J.) ("Thus, [when] a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including governmental agents."); *Johnson v. State*, 519 So2d 713, 714-15 (Ct. App. Fla. 1988) (holding that defendant who left suitcase with bailee without any effort to secure the privacy of his effects "reasonably assume[d] that the bailee would open the suitcase and/or authorize the police to do so").

consent.[28] And despite the fact that Sevilla-Carcamo had previously refused consent to a search of the vehicle, we decline her invitation to extend the Supreme Court of

---

[28] *See United States v. Eldridge*, 302 F2d 463, 466 (1962) (holding that bailee of vehicle gave valid consent to search when he was "clothed with rightful possession and control and could do in respect to the automobile whatever was reasonable and not inconsistent with its entrustment to him," and noting that "[n]o restriction was imposed on him except to return with the car by a certain hour" and that defendant "reserved no exclusive right of privacy in respect to the trunk [that contained stolen property] when he delivered the key"); *Hamilton v. State of NC*, 260 FSupp 632, 635 (E.D. NC 1966) (applying the holding in *United States v. Eldridge* to determine that bailee gave valid consent to search of automobile); *see also Basinski*, 226 F3d at 834 (II) (A) ("The key to third party consent is actual or apparent authority over the area to be searched"). *Cf. Seldon v. State*, 824 A2d 999, 1012 (I) (Md. Ct. App. 2003) (holding that mechanic could not consent to a search of portions of vehicle over which he had authority to access for repairs *after* repairs had been completed); *State v. Kurokawa-Lasciak*, 278 P3d 38, 44 (Or. Ct. App. 2012) (holding that third party lacked authority to validly consent to search when defendant gave the third party explicit instructions that imposed strict limits on access to the vehicle, such that limitations "did not encompass consenting to a search"). We note that after receiving the pastor's valid consent to search, the officers' search of the purse located within the automobile and ultimately found to contain the illegal contraband was also reasonable. *See Florida v. Jimeo*, 500 U.S. 248, 251 (111 SCt 1801, 114 LE2d 297) (1991) (holding that suspect's Fourth Amendment right was not violated when, after consenting to search of his car, officer opened folded, brown paper bag on floorboard and found kilogram of cocaine therein, and noting that suspect had not placed any explicit limitation on scope of search, making it objectively reasonable for officer to conclude that general consent included consent to search closed containers which might contain drugs).

the United States's narrow holding in *Randolph*[29] given the well-established differential treatment of residences and automobiles under the Fourth Amendment.[30]

Accordingly, for all of the foregoing reasons, we affirm the trial court's denial of Sevilla-Carcamo's motion to suppress evidence.

*Judgment affirmed. Ellington, P. J., and Peterson, J., concur.*

---

[29] *See generally* 547 U.S. at 106-23 (I)-(III); *id.* at 127 (Breyer, J., concurring) ("Given the case-specific nature of the Court's holding . . . I join the Court's holding and its opinion.").

[30] *See State v. Copeland*, 399 SW3d 159, 166-67 (II) (B) (2) (Crim. Ct. App. Tex. 2013) (holding that driver gave valid consent to search vehicle despite passenger–owner's refusal, and declining to extend the holding in *Randolph* when "it does not appear that the Supreme Court intended for *Randolph* to apply to vehicles because the social expectations for occupants of vehicles are unlike co-tenants in residences; people have a lessened expectation of privacy in vehicles as compared to residences; and *Randolph* was intended to narrowly apply only to the present, objecting co-tenant in a residence"); *see also Welch v. State*, 93 SW3d 50, 53-57 (III) (Crim. Ct. App. Tex. 2002) (holding that passenger gave valid consent to search vehicle when driver, in giving vehicle over to passenger, assumed the risk that passenger would consent to a search; and allowed passenger to have "mutual access and control over the vehicle for most purposes," whether or not a complete bailment existed, by failing to give any express limitations).