IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 33427-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | OPINION PUBLISHED IN PART |
| | ) | |
| JUSTIN DEAN VANHOLLEBEKE, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Justin Vanhollebeke appeals his conviction for first degree unlawful possession of a firearm. He argues (1) the warrantless search of the borrowed truck he was driving was unconstitutional because he refused to consent to the search, (2) the officers exceeded the lawful scope and purpose of the *Terry*[1] stop, (3) he did not knowingly and voluntarily waive his *Miranda*[2] rights, (4) the trial court abused its discretion when it declined to give his proposed missing witness instruction, (5) insufficient evidence supports the sentencing court's finding that he had the ability to pay legal financial obligations (LFOs), and (6) the State failed to prove his offender score

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

by a preponderance of the evidence. In his statement of additional grounds for review (SAG), he argues the dash camera videos from the officers' patrol cars should have been introduced at trial and the trial court did not allow defense counsel to investigate or present his case.

In the published portion of this opinion, we hold that a vehicle owner's consent to search overrides the borrower's express objection. In the unpublished portion of this opinion, we agree the State failed to prove Mr. Vanhollebeke's offender score by a preponderance of the evidence, but disagree with his remaining arguments. Accordingly, we affirm Mr. Vanhollebeke's conviction but remand for a new sentencing hearing.

## FACTS

On the night of November 10, 2014, Sergeant Aaron Garza was on patrol when he noticed a truck that was facing the wrong way on a one-way street. At 11:23 p.m., Sergeant Garza pulled the truck over. As Sergeant Garza was giving the truck's description and license plate number to dispatch, Mr. Vanhollebeke stepped out of the driver's side door. Sergeant Garza ordered Mr. Vanhollebeke to get back in the truck and then called for backup. Mr. Vanhollebeke got back in the truck.

Sergeant Garza got out of his patrol car and approached the truck. Mr. Vanhollebeke got out of the truck again and started walking toward Sergeant Garza. Sergeant Garza again ordered Mr. Vanhollebeke to get back in the truck. Mr. Vanhollebeke then said he had locked himself out of the truck. This unusual behavior made Sergeant Garza suspicious.

2

Sergeant Garza talked with Mr. Vanhollebeke near the side of the truck. At this point, Deputy Darryl Barnes and Officer Adam Lattin arrived. Mr. Vanhollebeke told Sergeant Garza he did not have a license or identification, but gave his name and date of birth. The other officers stayed with Mr. Vanhollebeke at the side of the truck while Sergeant Garza gave Mr. Vanhollebeke's information to dispatch.

Dispatch advised that Mr. Vanhollebeke's license was suspended. Dispatch also advised that Mr. Vanhollebeke was not the registered owner of the truck, and that the truck belonged to a man named Bill Casteel. This was around 15 to 20 minutes after Sergeant Garza initially stopped Mr. Vanhollebeke. Sergeant Garza's plan at this point was to cite Mr. Vanhollebeke for driving with a suspended license and then release him.

Sergeant Garza went to his car and began writing Mr. Vanhollebeke a citation with dispatch providing him Mr. Vanhollebeke's information. This made the process take longer than usual. While Sergeant Garza was writing the citation, Deputy Barnes did a cursory safety sweep of the truck. He noticed a glass pipe with a white crystal substance on it sitting in plain view near the dashboard, which he believed was drug paraphernalia. Deputy Barnes also noticed the truck's steering column was "punched," which indicated the truck was stolen.[3] Report of Proceedings (RP) at 106.

Deputy Barnes went to Sergeant Garza's car and told him about the pipe and the punched ignition. In light of this information, Sergeant Garza believed Mr. Vanhollebeke

---

[3] A punched ignition is one in which the ignition system has been dismantled or removed, so that a key is no longer used to start the vehicle.

3

may have committed a possession of a controlled substance offense as well as a vehicle theft offense. He believed these new offenses took priority over the driving while suspended citation. Because of these suspicions, Sergeant Garza decided not to let Mr. Vanhollebeke go.

The officers asked for permission to search the truck. Mr. Vanhollebeke refused. Sergeant Garza attempted to contact Mr. Casteel on the telephone but was unsuccessful. Because the officers had Mr. Casteel's address, Deputy Barnes volunteered to drive to Mr. Casteel's home, which was between 18 and 25 miles away. Deputy Barnes drove straight there and arrived around 12:14 a.m. Mr. Casteel told Deputy Barnes that Mr. Vanhollebeke had permission to use the truck. Mr. Casteel gave permission to search his truck and gave Deputy Barnes a key to it.

Deputy Barnes returned directly to the scene and arrived around 12:30 or 12:40 a.m. He gave Sergeant Garza the key and advised that Mr. Casteel gave the officers permission to search the truck. Sergeant Garza used the key to open the truck and began to search it. He looked under the driver's seat and saw a revolver. The glass pipe tested positive for methamphetamine. The officers confirmed through dispatch that Mr. Vanhollebeke had a prior felony conviction.

The State charged Mr. Vanhollebeke with first degree unlawful possession of a firearm. Mr. Vanhollebeke moved to suppress the physical evidence on the grounds that he had refused to give the officers consent to search the truck and also that the stop's

4

length and scope were unreasonable. The trial court found that the physical evidence was admissible and denied Mr. Vanhollebeke's motion.

The jury convicted Mr. Vanhollebeke. Mr. Vanhollebeke appeals.

## ANALYSIS

Mr. Vanhollebeke argues the search of the truck was unconstitutional because he had legitimate coauthority over the truck and he objected to the search. This court reviews constitutional issues de novo. *State v. Budd*, 185 Wn.2d 566, 571, 374 P.3d 137 (2016).

The Fourth Amendment to the United States Constitution guarantees people the right to be free from unreasonable searches and seizures. U.S. CONST. amend. IV. Warrantless searches are generally illegal unless they fall within one of the exceptions to the warrant requirement. *State v. Cantrell*, 124 Wn.2d 183, 187, 875 P.2d 1208 (1994). One exception is consent to search by a person with authority over the place or thing to be searched. *Id.* This exception includes consent given by a third person, other than the defendant. *Id.* at 188.

To grant valid consent, the third party must have common authority over the place or thing to be searched. *Id.* Common authority does not mean that the third party has a mere property interest in the place or thing being searched. *United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). Rather, "[t]o establish lawful consent by virtue of common authority: (1) 'a consenting party must be able to permit the search in his own right' and (2) 'it must be reasonable to find that the defendant has

5

assumed the risk that a co-occupant might permit a search.'" *State v. Thompson*, 151 Wn.2d 793, 804, 92 P.3d 228 (2004) (quoting *State v. Mathe*, 102 Wn.2d 537, 543-44, 688 P.2d 859 (1984)).

Our Supreme Court addressed a somewhat similar situation in *Cantrell*. In that case, Rudell Cantrell and his friend, Ingo Schweitzer, were driving in a car that Mr. Schweitzer's parents owned. *Cantrell*, 124 Wn.2d at 185. A state trooper stopped them for speeding and then asked if they had any contraband in the vehicle. *Id.* Knowing that Mr. Schweitzer's parents owned the vehicle, the trooper asked Mr. Schweitzer for permission to search his parents' car. *Id.* Mr. Schweitzer read and signed a consent form allowing the trooper to search the car. *Id.* at 186. The trooper did not ask Mr. Cantrell to sign a similar form. *Id.* Mr. Cantrell did not object when the trooper searched the car. *Id.* The trooper found marijuana, paraphernalia, and methamphetamine. *Id.* Mr. Cantrell was convicted. *Id.*

On appeal, the *Cantrell* court considered whether the police must obtain affirmative consent from all occupants who have approximately equal control over a vehicle before searching it without a warrant. *Id.* at 187. The court had previously held that the police must obtain affirmative consent from all cohabitants in an office building before searching the office without a warrant. *Id.* at 189 (citing *State v. Leach*, 113 Wn.2d 735, 782 P.2d 1035 (1989)). The main question in *Cantrell* was whether that prior holding should be extended to automobile searches. *Id.*

The *Cantrell* court held that the Fourth Amendment does not require all occupants of a vehicle to independently consent to a search and that the consent of one who possesses common authority over a vehicle is sufficient. *Id.* at 192. The court reasoned that third party consent cases turn on the suspect's reasonable expectation of privacy, and if the suspect has willingly allowed another person common authority over the place or thing, then he or she runs the risk that the third party will expose it to another person. *Id.* at 189. The court recognized that a person has a privacy interest in an automobile, but concluded that this expectation of privacy is less than the expectation of privacy in either a home or an office. *Id.* at 190.

However, the court limited its holding to the situation where one co-occupant consents and the others do not overtly object. The court expressly stated the "issue of whether such consent would continue to be valid as to a co-occupant if the co-occupant overtly objected to the search is not before us." *Id.* at 192.

This case is different from *Cantrell* in at least one important respect. Here, Mr. Vanhollebeke objected to the search whereas the defendant in *Cantrell* did not. Thus, this case presents the situation like the one the *Cantrell* court expressly declined to reach. We find no Washington authority addressing this situation.

The parties do not dispute that Mr. Vanhollebeke had a privacy interest in the truck. Nor do they dispute that Mr. Casteel had common authority to consent to the search. Thus, the central question is whether Mr. Casteel's consent overrode Mr. Vanhollebeke's express objection. The State argues it did because Mr. Casteel was the

7

truck's registered owner and, therefore, Mr. Casteel had an equal or superior interest in it.

Mr. Vanhollebeke's right to use the truck was dependent on the owner's unrevoked permission. This, we believe, limits Mr. Vanhollebeke's reasonable expectation of privacy. Some courts have utilized the law of bailments when analyzing whether an owner's consent to search overrides a borrower's refusal. *See* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 8.6(b) (consent by bailor) (5th ed. 2012).

An instructive case is *Hardy v. Virginia*, 17 Va. App. 677, 440 S.E.2d 434 (1994). There, an officer arrested the defendant for driving on a suspended license. *Id.* at 679. The defendant did not have car keys on him. *Id.* The officer determined the car belonged to the defendant's brother-in-law. *Id.* At some point, the brother-in-law appeared on the scene, admitted he owned the car, and said he had loaned it to the defendant for a few days. *Id.* The brother-in-law then consented to a search of the car. *Id.* The defendant objected. *Id.* The police searched the car, found cocaine, and the defendant was convicted. *Id.* at 679-80.

The *Hardy* court held that "[a]n owner of a motor vehicle may consent to a search of the vehicle over a bailee's objections if, at the time of the consent, the owner 'was either in possession or entitled to possession' of the vehicle." *Id.* at 681 (quoting *Anderson v. United States*, 399 F.2d 753, 756-57 (10th Cir. 1968)). The court reasoned that

8

> [a]n owner who allows another person to use his automobile retains ownership and the right to reclaim possession of the vehicle at will. While a bailee may have an expectation of privacy in the borrowed vehicle, that privacy interest is subordinate to the owner's right to his vehicle and right to reclaim possession of the vehicle at any time.

*Id.* The court further reasoned that when there is a bailment-at-will, the bailee in possession of property has an absolute duty to return it to the owner on demand. *Id.* at 681-82. Thus, when the brother-in-law arrived on the scene and gave his consent to search his vehicle, he had the right to reclaim possession. *Id.* Other courts have reached this same result "when the bailor was not in the immediate physical proximity of the vehicle at the time and instead made his wishes known to the police via some means of communication." LAFAVE, *supra* § 8.6(b) at 327.

Here, as bailee, Mr. Vanhollebeke had the actual right to exclude all others from the truck except for Mr. Casteel. For this reason, Mr. Vanhollebeke did not have a reasonable expectation of privacy if Mr. Casteel wanted to search his own truck or allow another person to do so.

Mr. Vanhollebeke urges us to reach a contrary result, and cites *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006). In *Randolph*, the United States Supreme Court addressed the question of whether a warrantless search of a home based on one co-occupant's consent is valid if the other co-occupant was present at the scene and "expressly refuse[d] to consent." *Id.* at 106. There, the defendant's estranged wife consented to a search of the marital residence after the defendant had "unequivocally refused" to give consent to search the house. *Id.* at 107. The Court held

9

that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120.

The *Randolph* Court reasoned that "[t]he constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules." *Id.* at 111. When a cotenant is present and objects to a visitor's entry into the home, social expectations require exclusion of the visitor. *Id.* at 114. The Court further explained that "[u]nless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior and inferior." *Id.*

It would be inappropriate to extend *Randolph* to this situation for several reasons. First, *Randolph* recognized that different societal expectations may arise when cotenants belong to a recognized hierarchy. The fact that Mr. Casteel owned the truck and gave Mr. Vanhollebeke permission to only borrow it created a "societal understanding of superior and inferior," so that he had the "right or authority to prevail over the express wishes" of Mr. Vanhollebeke. *Id.*

Second, other courts that have considered whether to extend *Randolph* to vehicles have declined to do so because of society's lessened expectation of privacy in vehicles as

compared to homes.[4] *See, e.g., Sevilla-Carcamo v. State*, 335 Ga. App. 788, 795, 783 S.E.2d 150 (2016) (declining "invitation to extend . . . *Randolph* given the well-established differential treatment of residences and automobiles under the Fourth Amendment"); *State v. Copeland*, 399 S.W.3d 159, 165 (Tex. Crim. App. 2013); *United States v. Lumpkins*, 687 F.3d 1011, 1014 (8th Cir. 2012) (suggesting that, because *Randolph* relied on "'the centuries-old principle of respect for the privacy of the home,'" it does not apply to cars) (quoting *Randolph*, 547 U.S. at 115).

Finally, *Randolph*'s holding expressly drew a "fine line" and was intended to affect only those cotenants who were physically present at the threshold and expressly refused consent. *Randolph*, 547 U.S. at 121-22. "Because the Supreme Court did not extend the holding in *Randolph* to those people who were nearby or inside the home but not at the threshold, it appears the Court intended to limit its holding to the narrowly drawn parameters of a residential search." *Copeland*, 399 S.W.3d at 166.

We conclude Mr. Casteel's consent to search his truck overrode Mr. Vanhollebeke's objection. Therefore, Sergeant Garza's search did not violate Mr. Vanhollebeke's reasonable expectation of privacy and the trial court did not err in denying Mr. Vanhollebeke's CrR 3.6 motion to suppress.

---

[4] Mr. Vanhollebeke argues that we should extend *Randolph* to vehicles because article I, section 7 of the Washington Constitution provides greater privacy protections to vehicles than the Fourth Amendment. However, we will not consider whether the state constitution provides greater protection than the federal constitution in a given case when the parties do not adequately brief the six factors found in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). *See Cantrell*, 124 Wn.2d at 190 n.19.

Affirmed.

A majority of the panel has determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder, having no precedential value, shall be filed for public record in accordance with RCW 2.06.040.

## ADDITIONAL FACTS

After Sergeant Garza searched the truck and discovered the revolver and the glass pipe containing suspected methamphetamine, Sergeant Garza arrested Mr. Vanhollebeke for possession of a controlled substance. This was at 12:49 a.m. Sergeant Garza searched Mr. Vanhollebeke incident to arrest and found three bullets in his front pocket. Sergeant Garza then placed Mr. Vanhollebeke into the patrol car and read him his *Miranda* rights from a department-issued card. Mr. Vanhollebeke stated he did not wish to speak to Sergeant Garza. Sergeant Garza said, "Okay" and did not ask any more questions. RP at 42.

Roughly 15 to 20 seconds later, Mr. Vanhollebeke spontaneously said the glass pipe was not in his possession. Sergeant Garza again asked Mr. Vanhollebeke if he was willing to talk, and Mr. Vanhollebeke said, "'Yes, sir.'" RP at 43. After arriving at the police station, Sergeant Garza asked Mr. Vanhollebeke questions about the revolver. Sergeant Garza did not re-read Mr. Vanhollebeke his *Miranda* rights. Mr. Vanhollebeke told Sergeant Garza he carried the revolver for protection and he knew he was not supposed to have it.

12

In addition to moving to suppress the physical evidence, Mr. Vanhollebeke also moved to suppress his postarrest statements to the officers. The trial court found that Mr. Vanhollebeke's statements were admissible and denied his motion.

At trial, the State introduced Mr. Vanhollebeke's postarrest statements about the revolver. The State did not call Mr. Casteel at trial, and Mr. Vanhollebeke requested a missing witness instruction. The trial court denied Mr. Vanhollebeke's request, finding that there was not a sufficient factual basis in the record for the instruction and that Mr. Casteel was not within the control or peculiarly available to the State.

At the sentencing hearing, the State indicated Mr. Vanhollebeke's standard range sentence was 26 to 34 months. Mr. Vanhollebeke argued that his prior conviction was from 2003 and therefore it was the State's burden to establish it had not washed out.[5] He argued the State failed to do this by a preponderance of the evidence.

The State then argued that for Mr. Vanhollebeke's conviction to wash out he would have needed to be crime-free in the community for 10 years. The State orally asserted that "there is essentially an uninterrupted string of convictions," and that the longest Mr. Vanhollebeke went without a conviction was about two years. RP at 495. The State concluded Mr. Vanhollebeke's 2003 second degree assault conviction did not wash out. Mr. Vanhollebeke did not object to the State's argument.

---

[5] The judgment and sentence calculated Mr. Vanhollebeke's offender score based on two prior convictions—both of which were from 2003. Mr. Vanhollebeke did not specify which of his prior convictions washed out, but appeared to believe his standard range was calculated based on an offender score of 1.

13

The State also asked the trial court to impose LFOs. The following exchange then occurred:

> THE COURT: Mr. Vanhollebeke, you're going to have a number of legal financial obligations. How much can you afford to pay a month?
> THE DEFENDANT: I'm currently locked up in here for jail, so my funds are at zero right now.
> THE COURT: I mean, after you get out, how much can you afford to pay?
> THE DEFENDANT: I had a job, sir, prior to coming in here.
> THE COURT: How much were you making?
> THE DEFENDANT: I—I just barely got it that day—two days before that, sir.
> THE COURT: What were you doing?
> THE DEFENDANT: Farm work. I was getting ready to do farm work and I lost that job, I'm pretty sure.
> THE COURT: Was that a (inaudible)?
> THE DEFENDANT: It would be anything that I could do.
> THE COURT: Could you afford $25 a month?
> THE DEFENDANT: At this time?
> THE COURT: When you get out.
> THE DEFENDANT: When I get out? If I can get a job, yes, sir, if I could (inaudible) myself.
> THE COURT: Other than your present predicament, are you healthy and able?
> THE DEFENDANT: Yes, sir.

RP at 495-96.

The court accepted the standard range calculation of 26 to 34 months and imposed 34 months' confinement. The trial court calculated Mr. Vanhollebeke's offender score at a 2 based on two prior convictions: a 2003 conviction for second degree assault and a 2003 conviction for taking a motor vehicle without permission. The trial court also imposed $1,380 in LFOs. Mr. Vanhollebeke did not object to the LFOs at the sentencing hearing.

## ADDITIONAL ANALYSIS

### A. DURATION AND SCOPE OF *TERRY* STOP

Mr. Vanhollebeke argues the officers exceeded the scope and purpose of a lawful *Terry* stop because they detained him for an hour and then searched the truck when they could have impounded it and issued him a citation. When a trial court denies a motion to suppress, this court reviews the trial court's conclusions of law de novo. *State v. Acrey*, 148 Wn.2d 738, 745, 64 P.3d 594 (2003).

A *Terry* stop permits an officer to briefly detain and question a person reasonably suspected of criminal activity. *Terry*, 392 U.S. at 27-28. A valid *Terry* stop "must be temporary, lasting no longer than is necessary to effectuate the purpose of the stop," and "the investigative methods employed must be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *State v. Williams*, 102 Wn.2d 733, 738, 689 P.2d 1065 (1984). "If the results of the initial stop dispel an officer's suspicions, then the officer must end the investigative stop." *Acrey*, 148 Wn.2d at 747. But if the officer's initial suspicions are confirmed or are further aroused, the scope of the stop may be extended and its duration may be prolonged. *Id.*

There is no rigid time limitation on *Terry* stops. *United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). While the length of the stop is an important factor in determining whether reasonable suspicion justifies the seizure, courts must also consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. *Id.* In assessing whether a

15

detention is too long, courts examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686. Although a court engaged in a post hoc evaluation of police conduct "can almost always imagine some alternative means by which the objectives of the police might have been accomplished," "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Id.* at 686-87. Officers may also temporarily detain a suspect pending the results of a police radio check. *State v. Perea*, 85 Wn. App. 339, 342, 932 P.2d 1258 (1997).

Here, the officers did not exceed the scope of the investigative detention. Sergeant Garza stopped Mr. Vanhollebeke for facing the wrong way on a one-way street and then discovered Mr. Vanhollebeke's license was suspended. As he was writing Mr. Vanhollebeke a citation, Deputy Barnes walked around the truck and saw the punched ignition and the glass pipe with a white crystal substance on it, both of which were in plain view. Based on his training and experience, Sergeant Garza believed that Mr. Vanhollebeke may have committed a possession of a controlled substance offense and a vehicle theft offense.

Mr. Vanhollebeke argues that the police should have issued him the citation for driving with a suspended license, impounded the truck, and then let him go. However, when an officer's initial suspicions are further aroused, the police may extend the stop's scope. The punched ignition and the glass pipe with the white crystal substance on it

gave Sergeant Garza reasonable suspicion to continue the detention. *See, e.g., State v. Rose*, 175 Wn.2d 10, 18-22, 282 P.3d 1087 (2012) (officer had probable cause to arrest for possession of controlled substance, where during course of investigatory detention, officer observed in plain view glass tube protruding from defendant's bag that contained white residue, which, in light of his training, he believed was cocaine or methamphetamine). The scope of the detention was proper.

The officers also did not exceed the permissible duration of the investigative detention. Sergeant Garza pulled Mr. Vanhollebeke over at 11:23 p.m. During the next 15 to 20 minutes, Sergeant Garza awaited backup, talked with Mr. Vanhollebeke at the side of the truck, verified Mr. Vanhollebeke's identity, awaited information from dispatch, and awaited confirmation of warrants from another county. He was allowed to detain Mr. Vanhollebeke while waiting for dispatch to get back to him. He also began writing a citation, which took longer than usual because Mr. Vanhollebeke did not have a license. It was at this point that Deputy Barnes observed the punched ignition and glass pipe.

At this point, law enforcement suspected Mr. Vanhollebeke might have committed the offenses of possession of a controlled substance and theft of a motor vehicle. Sergeant Garza attempted to confirm or dispel his suspicions by asking Mr. Vanhollebeke for permission to search the truck and trying to contact Mr. Casteel, the truck's owner. Mr. Vanhollebeke refused to give permission to search, and Sergeant Garza was unable to reach Mr. Casteel. Deputy Barnes then promptly drove to Mr. Casteel's house,

17

confirmed with Mr. Casteel the truck was borrowed, and obtained his permission to search and a truck key. Deputy Barnes returned directly to the scene, arriving between 12:30 and 12:40 a.m.

Mr. Vanhollebeke argues that Deputy Barnes could have called Sergeant Garza at the scene and advised him that Mr. Casteel had given Mr. Vanhollebeke permission to use the truck, rather than driving all the way back to inform Sergeant Garza in person. This argument ignores the fact that the officers were entitled to complete their investigation of the possession of narcotics offense before allowing Mr. Vanhollebeke to leave.

Here, the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions that Mr. Vanhollebeke committed theft of a motor vehicle and possession of a controlled substance. We conclude the officers did not exceed the lawful scope and duration of the *Terry* stop.

B.   WAIVER OF *MIRANDA* RIGHTS

Mr. Vanhollebeke argues that he did not knowingly and voluntarily waive his *Miranda* rights after he initially told Sergeant Garza that he did not want to talk.

When an individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. However, the police may resume questioning under certain circumstances even if the defendant has asserted his or her right to silence. *State v. Elkins*, 188 Wn. App. 386, 397, 353 P.3d 648, *review denied*, 184 Wn.2d 1025, 361 P.3d

18

748 (2015). Further questioning of a suspect is allowed provided the following conditions exist: (1) the right to cut off questioning was scrupulously honored, (2) the police did not engage in further words or actions amounting to interrogation before obtaining a waiver, (3) the police did not engage in tactics tending to coerce the suspect to change his or her mind, and (4) the subsequent waiver was knowing and voluntary. *State v. Wheeler*, 108 Wn.2d 230, 238, 737 P.2d 1005 (1987).

"[T]here is no bright-line rule that law enforcement officers must always fully readvise a defendant of his or her *Miranda* rights." *Elkins*, 188 Wn. App. at 396. Rather, the question of "whether a defendant's rights have been scrupulously honored must be determined on a case-by-case basis." *Id.* The key concern is that the defendant understands his or her rights and also understands that those rights are still in effect. *Id.* at 401.

A waiver may be inferred from the defendant's understanding of his or her rights and the voluntariness of his or her conversation with police officers. *State v. Mason*, 31 Wn. App. 41, 46, 639 P.2d 800 (1982) (fact that defendant requested to talk to police and then blurted out his confession is evidence of a voluntary waiver). Suspects may waive a previous exercise of their constitutional rights by their own voluntary and unsolicited actions without first having the *Miranda* warnings reread to them. *State v. Boggs*, 16 Wn. App. 682, 687, 559 P.2d 11 (1977).

Here, after Mr. Vanhollebeke indicated he did not wish to speak, Sergeant Garza said, "Okay" and did not ask any more questions. RP at 42. There is no evidence that he

engaged in further words or actions amounting to interrogation or tried to get Mr. Vanhollebeke to change his mind. Mr. Vanhollebeke then spontaneously stated the glass pipe was not in his possession. Sergeant Garza again asked Mr. Vanhollebeke if he was willing to talk, and Mr. Vanhollebeke said, "'Yes, sir.'" RP at 43.

Mr. Vanhollebeke argues that Sergeant Garza should have readvised him of his *Miranda* rights, but in this particular case this was not necessary. Sergeant Garza had just advised him of his *Miranda* rights 15 or 20 seconds prior, so it is likely Mr. Vanhollebeke understood those rights and also understood that they were still in effect. Like in *Mason*, it can also be inferred that Mr. Vanhollebeke knowingly and voluntarily waived his *Miranda* rights because he spontaneously stated the glass pipe was not in his possession. We conclude Sergeant Garza's subsequent questioning was constitutionally permissible.

C.    MISSING WITNESS INSTRUCTION

Mr. Vanhollebeke next contends the trial court erred when it denied his request for a missing witness instruction. He argues that because the State did not call Mr. Casteel as a witness, he was entitled to argue to the jury that it should infer that Mr. Casteel's testimony would have been unfavorable to the State's case. This court reviews a trial court's refusal to issue a missing witness instruction for an abuse of discretion. *State v. Reed*, 168 Wn. App. 553, 571, 278 P.3d 203 (2012).

A missing witness instruction informs the jury that it may infer from a witness's absence at trial that his or her testimony would have been unfavorable to the party who

20

would logically have called that witness. *Id.* "Such an instruction is proper where the witness is peculiarly available to one of the parties, and the circumstances at trial establish that, as a matter of reasonable probability, the party would not have knowingly failed to call the witness 'unless the witness's testimony would be damaging.'" *Id.* (citation omitted) (quoting *State v. Davis*, 73 Wn.2d 271, 280, 438 P.2d 185 (1968), *overruled on other grounds by State v. Abdulle*, 174 Wn.2d 411, 275 P.3d 1113 (2012)). Whether a witness is peculiarly available to a party depends on the nature of the relationship between the witness and that party. *Id.* at 572. The doctrine does not apply if the uncalled witness is equally available to the parties. *Id.* at 573.

Here, Mr. Casteel was not within the control of or peculiarly available to the State. Instead, Mr. Vanhollebeke's relationship with Mr. Casteel was such that he had permission to borrow Mr. Casteel's truck. If Mr. Vanhollebeke believed Mr. Casteel's testimony would be unfavorable to the State's case, he had every opportunity to call him as a witness. We conclude the trial court did not abuse its discretion when it denied Mr. Vanhollebeke's request for a missing witness instruction.

D.    UNPRESERVED ALLEGED LFO ERROR

Mr. Vanhollebeke argues, for the first time on appeal, that insufficient facts support the trial court's determination that he has the ability to pay LFOs.

"A defendant who makes no objection to the imposition of discretionary LFOs at sentencing is not automatically entitled to review." *State v. Blazina*, 182 Wn.2d 827, 832, 344 P.3d 680 (2015). RAP 2.5(a) provides that an "appellate court may refuse to

21

review any claim of error which was not raised in the trial court." *Blazina* confirmed that an appellate court's discretion under RAP 2.5(a) extends to review of a trial court's imposition of discretionary LFOs. *Blazina*, 182 Wn.2d at 834-35.

Mr. Vanhollebeke nevertheless argues the trial court's finding is reviewable for the first time on appeal because it concerns the sufficiency of the evidence supporting the LFO imposition. In support of this argument, Mr. Vanhollebeke cites RAP 2.5(a)(2) and *Roberson v. Perez*, 156 Wn.2d 33, 39-40, 123 P.3d 844 (2005) (holding appellants could raise issue for the first time on appeal under RAP 2.5(a)(2)). We recently rejected this precise argument in *State v. Clark*, 195 Wn. App. 868, 873-77, 381 P.3d 198 (2016) (holding that RAP 2.5(a)(2) does not require appellate courts to consider unpreserved LFO challenges).

Under *Blazina*, each appellate court is entitled to "make its own decision to accept discretionary review" of unpreserved LFO errors. *Blazina*, 182 Wn.2d at 835. Admittedly, the judges of this court are not in agreement as to what extent discretion should be exercised to review unpreserved LFOs. An approach favored by this author is to consider the administrative burden and expense of bringing a defendant to court for a new hearing, versus the likelihood that the discretionary LFO result will change. *State v. Arredondo*, 190 Wn. App. 512, 538, 360 P.3d 920 (2015), *review granted in part*, 185 Wn.2d 1024, 369 P.3d 502 (2016). "An important consideration of this analysis is the dollar amount of discretionary LFOs imposed by the sentencing court." *Id.* In this case,

the majority of these factors weigh against reviewing Mr. Vanhollebeke's unpreserved LFO challenge.

First, the dollar amount of the discretionary LFOs the trial court imposed does not support granting review. The trial court imposed both mandatory and discretionary LFOs. The mandatory LFOs included the $500 victim assessment, $200 criminal filing fee, and the $100 deoxyribonucleic acid (DNA) collection fee. *See* RCW 7.68.035(1)(a); RCW 36.18.020(2)(h); RCW 43.43.7541. These mandatory LFOs are required irrespective of Mr. Vanhollebeke's ability to pay. *State v. Lundy*, 176 Wn. App. 96, 103, 308 P.3d 755 (2013). The discretionary LFOs in this case were the $350 court-appointed attorney fee and $230 sheriff's service fee, totaling $580.

The second factor—the administrative burden and expense of bringing Mr. Vanhollebeke to court for a new sentencing hearing—weighs in favor of granting review. As discussed, remand is required for the trial court to address another sentencing error.

However, the final factor weighs against granting review—the LFO result would not likely change. At the sentencing hearing, Mr. Vanhollebeke indicated he could afford $25 per month LFO payments when he is released from confinement. He also indicated that he was recently employed doing farm work at the time of his arrest, and that he is healthy and able to work.

Considering the small amount of discretionary LFOs imposed in this case and the unlikelihood that the LFO result would change, we exercise our discretion and decline to review this alleged error.

E.    OFFENDER SCORE

Mr. Vanhollebeke challenges his offender score, contending the State failed to prove that his prior 2003 second degree assault conviction had not washed out.[6] This court reviews the sentencing court's calculation of the offender score de novo. *State v. Rivers*, 130 Wn. App. 689, 699, 128 P.3d 608 (2005).

A criminal defendant's offender score is calculated by examining the defendant's criminal history, which is a list of his or her prior convictions. *See* RCW 9.94A.030(11); RCW 9.94A.525. "Prior convictions result in offender score 'points' in accordance with rules provided by RCW 9.94A.525." *State v. Zamudio*, 192 Wn. App. 503, 507, 368 P.3d 222 (2016). In determining the proper offender score, the court "may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing." RCW 9.94A.530(2).

Prior convictions are not counted as points if, through crime-free time spent in the community, they have "washed out" according to criteria provided by statute. *Zamudio*, 192 Wn. App. at 507. Most class B felonies wash out after the defendant spends 10 consecutive years in the community without any subsequent convictions. RCW 9.94A.525(2)(b). Most class C felonies wash out after five years. RCW 9.94A.525(2)(c).

Unless the defendant pleads guilty, he or she is not obligated to present evidence of his or her criminal history. *State v. Hunley*, 175 Wn.2d 901, 910, 287 P.3d 584 (2012).

---

[6] Mr. Vanhollebeke does not argue the trial court erred when it considered his 2003 taking a motor vehicle without permission conviction in calculating his offender score.

Rather, the State bears the burden to prove the existence of prior convictions by a preponderance of the evidence. *Id.* at 909-10. This includes the burden to prove that prior convictions have not washed out for the purpose of calculating a defendant's offender score. *In re Pers. Restraint of Cadwallader*, 155 Wn.2d 867, 876-78, 123 P.3d 456 (2005). "Bare assertions, unsupported by evidence, do not satisfy the State's burden to prove the existence of a prior conviction." *Hunley*, 175 Wn.2d at 910.

The State fails to meet the preponderance standard when it orally summarizes the defendant's prior convictions and does not introduce any other evidence. *Id.* at 911-12. This lack of evidence, if it results in the convictions being counted toward the defendant's offender score, falls "below even the minimum requirements of due process." *State v. Ford*, 137 Wn.2d 472, 481, 973 P.2d 452 (1999). This is because "'a prosecutor's assertions are neither fact nor evidence, but merely argument.'" *Hunley*, 175 Wn.2d at 912 (quoting *Ford*, 137 Wn.2d at 483 n.3.). "Accordingly, the defendant's mere failure to object to State assertions of criminal history at sentencing does not result in an acknowledgment. There must be some *affirmative* acknowledgment of the facts and information alleged at sentencing in order to relieve the State of its evidentiary obligations." *Id.* (citation omitted).

Here, the State orally asserted during the sentencing hearing that Mr. Vanhollebeke had many convictions in the last 10 years and therefore his prior second degree assault conviction did not wash out. Other than these bare assertions, it presented no other evidence supporting this conclusion. Mr. Vanhollebeke never affirmatively

25

acknowledged this information. Thus, like the State's oral summaries in *Hunley* and *Ford*, the State failed to meet the preponderance standard.

Citing RCW 9.94A.530(2), the State argues that the trial court properly calculated Mr. Vanhollebeke's offender score because Mr. Vanhollebeke failed to object to the State's assertion at the sentencing hearing. However, *Hunley* held that this provision is facially unconstitutional because the defendant is not obligated to present evidence. *See Hunley*, 175 Wn.2d at 914, 917. We, therefore, reject the State's argument that Mr. Vanhollebeke acknowledged his criminal history by not objecting to it.

The State failed to prove by a preponderance of the evidence that Mr. Vanhollebeke's conviction for second degree assault had not washed out. We, therefore, remand for a resentencing hearing where the State will have the opportunity to present "all relevant evidence regarding criminal history, including criminal history not previously presented" in order to establish that the convictions have not washed out. RCW 9.94A.530(2); *State v. Jones*, 182 Wn.2d 1, 10-11, 338 P.3d 278 (2014) (a sentencing court is permitted to consider new, permissible evidence on remand).

F.   OFFICERS' DASH CAMERA VIDEOS

In his first SAG argument, Mr. Vanhollebeke argues that none of the dash camera videos from the police cars at the scene were viewed or introduced into evidence. However, this argument depends on evidence that is outside the record in this case. There is nothing in this appellate record regarding what information these videos could

have supplied or if their contents would have been any different than the police officers' testimony, or if they even exist at all.

Because the record is inadequate to determine whether the lack of these videos prejudiced Mr. Vanhollebeke's defense, this court cannot consider this issue on direct review. *See State v. McFarland*, 127 Wn.2d 322, 337-38, 899 P.2d 1251 (1995). The appropriate means of litigating this issue is through a personal restraint petition. *Id.* at 335.

### G. TRIAL COURT ALLEGEDLY SHUTTING DOWN DEFENSE COUNSEL

In his second SAG argument, Mr. Vanhollebeke first argues that the trial court did not allow defense counsel to properly investigate the case or prepare for trial. Like his previous SAG argument, this argument depends on evidence that is outside the record and therefore this court cannot consider this issue on direct review. *Id.* at 337-38.

Mr. Vanhollebeke also argues that the trial court shut down defense counsel whenever he spoke or presented evidence. However, the record indicates that defense counsel had ample opportunity to present Mr. Vanhollebeke's case. The trial court invited defense counsel to "introduce any further briefing that he sees fit," and repeatedly asked if defense counsel had any other comments or arguments to add. RP at 181; *see also* RP at 184, 198, 222, 368. Trial court asked if defense counsel had rebuttal argument. The trial court also granted defense counsel's motion for a mistrial.

Further, when the trial court overruled defense counsel, it was on the merits of his evidentiary objection. The trial court also sustained many of defense counsel's

27

objections. The record does not support Mr. Vanhollebeke's argument that the trial court shut down defense counsel whenever he spoke or presented evidence.

Affirmed and remanded for resentencing.

Lawrence-Berrey, J.

WE CONCUR:

Fearing, C.J.

Korsmo, J.