FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE     MAR 1 5 2018
Fairhurst, CJ
CHIEF JUSTICE

This opinion was filed for record

at 8:00 Am     on March 15, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 94054-1 |
| Respondent, | EN BANC |
| v. | |
| JUSTIN DEAN VANHOLLEBEKE, | Filed     MAR 1 5 2018 |
| Petitioner. | |

GORDON McCLOUD, J.—Justin Vanhollebeke drove his truck the wrong way down a one-way street. Not surprisingly, an officer stopped him. Vanhollebeke ignored the officer's command to stay in the vehicle, got out and locked the vehicle behind him, left a punched out ignition and apparent drug paraphernalia behind in plain view of the police, and had no key. The police asked Vanhollebeke for consent to search the vehicle. Vanhollebeke refused. A police officer then contacted the truck's owner, received the absent owner's consent and a key to search, and then returned to search the vehicle.

Vanhollebeke was charged with unlawful possession of a firearm found in the truck, and he challenged the legality of the vehicle search. The officer lacked a warrant, and the State relies instead on an exception to the warrant requirement: the owner's consent.

We hold that the present driver's refusal to consent to the search of his or her vehicle must generally be respected. But where, as here, circumstances like a punched out ignition and a driver with no key raise a significant question about whether the driver had any legitimate claim to the vehicle at all, the police may contact the absent owner and then get that owner's consent to search instead.

We therefore affirm the Court of Appeals.

FACTS

Sergeant Aaron Garza of the Othello Police Department observed Vanhollebeke's truck facing the wrong way on a one-way street at an intersection. Clerk's Papers (CP) at 34 (Finding of Fact (FF) 1.1); RP (Jan. 20, 2015) at 11-12; (RP) (May 20, 2015) at 310-11. Garza pulled Vanhollebeke over. RP (Jan. 20, 2015) at 12; RP (May 20, 2015) at 311. Ignoring repeated commands to remain in his vehicle, Vanhollebeke finally exited from the truck and stated that he had locked himself out and did not have a key. CP at 34 (FF 1.2). Finding this behavior unusual, Garza called for backup. RP (Jan. 20, 2015) at 13-15; RP (May 20, 2015) at 314-16. After the other officers arrived, dispatch advised that Vanhollebeke had a suspended

2

license. CP at 35 (FF 1.4); RP (Jan. 20, 2015) at 18.[1] Garza began writing a citation for driving while license suspended. RP (Jan. 20, 2015) at 22.

One of the other officers, Deputy Darryl Barnes, saw a glass pipe containing a white crystal substance on the truck's dashboard and noticed that the ignition had been punched out. CP at 35 (FF 1.5); RP (Jan. 20, 2015) at 103, 106. The officers suspected that the truck might be stolen or contain controlled substances and asked Vanhollebeke for permission to search it. RP (Jan. 20, 2015) at 23, 28. Vanhollebeke refused. *Id.* at 28.

Garza then tried to reach the truck's registered owner, Bill Casteel. CP at 35 (FF 1.6); RP (Jan. 20, 2015) at 28-29. Garza couldn't reach Casteel by phone, so Barnes drove to Casteel's home, about 20 miles away, instead. CP at 35 (FF 1.6); RP (Jan 20, 2015) at 30. Garza's police report states that Barnes went to Casteel's home seeking permission to search the vehicle;[2] it does not say anything about ascertaining whether the vehicle was stolen. CP at 20-21; RP (Jan. 20, 2015) at 58-59. Barnes testified that when he spoke with Casteel:

> I told him that we had the gentleman there on a traffic stop and did he know where his truck was and did he know who had his truck and that

---

[1] Dispatch also advised that Vanhollebeke had warrants out for his arrest, but Garza could not confirm these warrants and never intended to arrest Vanhollebeke on them. RP (Jan. 20, 2015) at 18-21.

[2] CP at 21 ("I spoke to Deputy Barnes and he told me he would be willing to drive to Hatton and make contact with Casteel to see if we could get permission to search his truck.").

3

what I found - - what I saw inside the truck and did he have a problem with me searching it.

RP (Jan. 20, 2015) at 109. Casteel said that Vanhollebeke had permission to use the truck, but he also expressed concern about the suspected drug paraphernalia. *Id.* at 109-110. He consented to a search of the truck and gave Barnes a key. *Id.*; CP at 35 (FF 1.7). According to Barnes:

> [F]rom what I can remember, [Casteel] was in disgust about his truck being stopped by law enforcement and did say that the gentleman had permission to use the truck, was concerned that I found drug - - that I saw what appeared to be drug paraphernalia in the truck.
>
> And I asked, "Hey, can we search your truck? If not, the city would impound it and they would search it, but they're willing to just search it on scene. Are you okay with that?"
>
> He's like, "Sure," gave me the key.

RP (Jan. 20, 2015) at 109-110.[3] Casteel was sick and declined Barnes's invitation to accompany him back to the scene. *Id.* at 110.

When Barnes arrived back at the truck, he gave Garza the key and told him that Casteel had consented to the search. RP (Jan. 20, 2015) at 32. The officers then

---

[3] Barnes's statements to Casteel regarding impoundment may have been incorrect. Before the other officers discovered the pipe, Garza had intended to cite Vanhollebeke only for driving with license suspended and then release him. RP (Jan. 20, 2015) at 21-22. No officer testified that there was any discussion of an arrest before Barnes left to contact Casteel. Barnes testified that he was not aware of Garza's intent when he spoke with Casteel. *Id.* at 132. Still, there was no dispute in the trial court, nor is there now any dispute, that officers could have arrested Vanhollebeke on the suspended license charge.

searched the passenger compartment and discovered a gun under the driver's seat. *Id.* at 33. The pipe on the dashboard tested positive for methamphetamine, and officers arrested Vanhollebeke for possession of a controlled substance. *Id.* at 39. Dispatch advised that Vanhollebeke was a convicted felon. *Id.* at 77-78.

The State charged Vanhollebeke with one count of first degree unlawful possession of a firearm. CP at 3-4; RP (May 19, 2015) at 230-31. Vanhollebeke moved to suppress the fruits of the search, arguing that the warrantless search was unconstitutional. CP at 5-12; RP (Jan. 20, 2015) at 150-51. The trial court denied the motion, CP at 37, reasoning that "there's a reduced expectation of privacy in a borrowed vehicle." RP (Jan. 20, 2015) at 153. The trial court made no explicit findings of fact regarding the officers' motivation for contacting Casteel.[4] Vanhollebeke was found guilty, sentenced to 34 months confinement, and assessed fees of $1,380. RP (May 21, 2015) at 482-85; CP at 141-46.

---

[4] *See* CP at 35 (FF 1.6, 1.7) ("Unable to reach him by phone, Deputy Barnes drove to Mr. Casteel's home." "There he advised Mr. Casteel of the situation involving his truck, explained that he did not have to consent to a search of the truck, gave him the option to accompany the deputy back to the truck, and eventually was given a key by Mr. Casteel.").

PROCEDURAL HISTORY

Vanhollebeke appealed on several grounds, and the Court of Appeals affirmed the conviction.[5] *State v. Vanhollebeke*, 197 Wn. App. 66, 68, 387 P.3d 1103 (2016), *review granted*, 188 Wn.2d 1001, 393 P.3d 360 (2017). The only issue before this court is the constitutionality of the search.

The Court of Appeals began by acknowledging that this case presented a question left open by *State v. Cantrell*, 124 Wn.2d 183, 875 P.2d 1208 (1994): whether the driver of a borrowed car can, by expressly objecting to a search, override the consent of another person with "common authority" over the vehicle.[6] *Vanhollebeke*, 197 Wn. App. at 72-73. It then considered a Virginia case holding that people have limited expectations of privacy in borrowed vehicles because the owner can reclaim possession at any time. *Id.* at 73-74 (citing and quoting *Hardy v. Virginia*, 17 Va. App. 677, 440 S.E.2d 434 (1994)). The Court of Appeals adopted that rationale and held that "as bailee, Mr. Vanhollebeke had the actual right to

---

[5] The Court of Appeals remanded for a new sentencing hearing because it agreed with Vanhollebeke that the State failed to prove his offender score by a preponderance of the evidence. *Vanhollebeke*, 197 Wn. App. at 68.

[6] *Cantrell* held that where the passenger in a borrowed car consents to a search of that car and the driver does not object, contraband found in the search is admissible against the nonobjecting driver. 124 Wn.2d at 188-191. The *Cantrell* court explicitly declined to decide whether the result would be different if the vehicle's nonconsenting occupant objected instead of remaining silent. *Id.* at 192.

exclude all others from the truck except for Mr. Casteel[, and] [f]or this reason, Mr. Vanhollebeke did not have a reasonable expectation of privacy if Mr. Casteel wanted to search his own truck or allow another person to do so." *Vanhollebeke*, 197 Wn. App. at 74. The Court of Appeals also rejected Vanhollebeke's argument that the Fourth Amendment rule announced in *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006)—that police may not search a home where one present occupant objects and another present occupant consents—should apply in this vehicle context. *Vanhollebeke*, 197 Wn. App. at 74-76; U.S. CONST. amend. IV. It reasoned that *Randolph* was limited to the situation in which two people have *equal* authority over a *residence* (a constitutionally privileged site). *Id.*

Neither the Court of Appeals in this case nor the *Cantrell* court analyzed the issue under Washington Constitution article I, section 7. *Cantrell*, 124 Wn.2d at 190 n.19; *Vanhollebeke*, 197 Wn. App. at 75 n.4. Both courts held that the briefing was inadequate to present the question of an independent state constitutional analysis. *Cantrell*, 124 Wn.2d at 190 n.19; *Vanhollebeke*, 197 Wn. App. at 75 n.4. Vanhollebeke provided an independent state constitutional argument under *State v. Gunwall*[7] for the first time in his supplemental brief to this court. Suppl. Br. of Pet'r at 17-26. The State submitted supplemental briefing in response.

---

[7] 106 Wn.2d 54, 720 P.2d 808 (1986). Under *Gunwall*, a court determines whether a state constitutional provision is more protective than its federal counterpart by considering six nonexclusive factors: (1) the text of the state constitutional provision at

STANDARD OF REVIEW

We review claims that constitutional rights were violated de novo. *State v. Iniguez*, 167 Wn.2d 273, 280, 217 P.3d 768 (2009).

ANALYSIS

I.  Warrantless searches are presumptively unconstitutional, unless they fit within one of the few, narrow exceptions to the warrant requirement

Under both the Washington and United States Constitutions, warrantless searches are per se unreasonable. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996). However, there are a few "'jealously and carefully drawn' exceptions" to the warrant requirement. *Arkansas v. Sanders*, 442 U.S. 753, 759, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979) (quoting *Jones v. United States*, 357 U.S. 493, 499, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958)), *abrogated by California v. Acevedo*, 500 U.S. 565, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991). One of those exceptions is for consent, and consent is the exception at issue here. *State v. Mathe*, 102 Wn.2d 537, 541, 688 P.2d 859 (1984) ("Consent to a search establishes the validity of that search if the person giving consent has the authority to so consent.").

---

issue, (2) significant differences between the text of parallel state and federal constitutional provisions, (3) state constitutional and common law history, (4) state law predating the state constitution, (5) structural differences between the state and federal constitutions, and (6) matters of particular state or local concern. *Id.* at 61-62.

The defendant challenged the warrantless search of the borrowed car over his explicit objection. As the criminal defendant charged with a possessory offense resulting from the search, Vanhollebeke has standing to raise this claim. *State v. Williams*, 142 Wn.2d 17, 23, 11 P.3d 714 (2000).

II.     While the driver of an absent owner's vehicle does not ordinarily assume the risk that the absent owner will consent to a search, the driver does assume that risk where the facts reasonably suggest it is stolen

     *A. The federal and state two-part test for authority to consent to search in "common authority" cases*

Vanhollebeke now challenges the search of his truck under both the Fourth Amendment and article I, section 7. In this situation, we generally analyze the Washington State Constitution first. This is true for several reasons, including the fact that the Washington Constitution is more protective of individual privacy. *State v. MacDicken*, 179 Wn.2d 936, 940, 319 P.3d 31 (2014) (citing *State v. Walker*, 157 Wn.2d 307, 313, 138 P.3d 113 (2006)).

But we have previously held that third-party consent issues (like the one raised here) should be analyzed under the Fourth Amendment first. Specifically, in *Mathe*—a case addressing a landlord's consent to the search of his tenant's bedroom—this court expressly adopted the Fourth Amendment's two-part test for "questions of [third-party] consent issues under Const. art. [I], § 7." 102 Wn.2d at 543. Neither party argues that we should discard the *Mathe* court's adoption of the

Fourth Amendment's common authority test as a starting point.[8] For these reasons, we begin with the combined state and federal constitutional test for determining the validity of third-party consent to search shared property.[9]

The Fourth Amendment standard for valid third-party consent to a search, which this court adopted in *Mathe* and reaffirmed in *State v. Leach*, 113 Wn.2d 735, 738-40, 782 P.2d 1035 (1989), is a two-part test: (1) Did the consenting party have authority to permit the search in his own right? And if so, (2) did the defendant assume the risk that the third party would permit a search?[10] Both this court and the

---

[8] Suppl. Br. of Resp't re: *Gunwall* Analysis at 5-6 ("[T]his Court has specifically adopted the federal 'common authority' standard enunciated in *U.S. v. Matlock* for the purpose of determining issues of consent under article I, section 7 of the State Constitution. The defendant has provided no authority why this Court should now abandon that holding." (citations omitted)).

[9] *Mathe* predates *Gunwall*—and thus does not consider *Gunwall*'s analysis. The *Mathe* court acknowledged that article I, section 7 may provide protections different from those in the Fourth Amendment, but nevertheless expressly adopted the federal standard because "this rule best balances the interest of the police in conducting searches and our citizens' right to privacy in their homes." 102 Wn.2d at 543. We reaffirmed that holding in a post-*Gunwall* case, *State v. Leach*, 113 Wn.2d 735, 738-39, 782 P.2d 1035 (1989), where we applied the two-part federal "common authority" test in an article I, section 7 challenge to the search of an office. As discussed above, no one challenges that basic analytical framework.

[10] *Leach*, 113 Wn.2d at 739-40 (citing *Mathe*, 102 Wn.2d at 543-44); *Mathe*, 102 Wn.2d at 543-44 (adopting the "common authority rule" from *United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974)); *Matlock*, 415 U.S. at 171 n.7 (under the "common authority" rule, third-party consent is valid where "any of the co-inhabitants has the right to permit the inspection in his own right and . . . the others have assumed the risk that one of their number might permit the common area to be searched"); *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) (joint user of duffel bag had actual authority to consent to its search and, in allowing joint user to use the

United States Supreme Court refer to this test as the "common authority rule."

*Mathe*, 102 Wn.2d at 543-44; *United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974)).

> *B. The consenting party, the owner, clearly had the authority to consent to the search in his own right*

There is no dispute that the first part of the test is satisfied in this case as the truck's owner, Casteel, could clearly consent to its search "in his own right."

> *C. The driver of a car owned by another does not ordinarily assume the risk that the owner will consent to a search*

We then proceed to the second part of the *Mathe/Matlock* test: whether Vanhollebeke, by borrowing Casteel's truck, assumed the risk that Casteel might allow others to search it.

As discussed above, the trial court held a hearing on the validity of Casteel's consent. The trial court judge found that

> 1.2 The defendant exited the vehicle and locked it. He did not have a key and was not able to re-enter the vehicle.
> 1.3 The defendant did not have identification with him.
> 1.4 . . . [Officers] learned that he was driving on a suspended license and had warrants out of Grant County. . . .
> 1.5 Officers . . . detained him further once they observed a meth pipe and punched out ignition in the car he was driving. . . .
> 1.6 Unable to reach [Casteel] by phone, Deputy Barnes drove to Mr. Casteel's home.

---

bag, defendant assumed the risk that he would consent to its search; therefore, joint user's third-party consent validated search of duffel bag).

11

. . . .

    1.9   Defendant's interest in the vehicle was permissive and pursuant to an oral agreement between himself and the registered owner.

CP at 34-35. Beyond a brief acknowledgement that Vanhollebeke had Casteel's consent to use the vehicle, RP (Jan. 20, 2017) at 128, Vanhollebeke did not present any evidence indicating that he had exclusive use of the vehicle or that Casteel had loaned him the car for any set length of time, nor any number of other scenarios that could demonstrate more clearly defined privacy expectations or property rights.[11] No one challenges these factual findings.

The trial court judge then concluded as a matter of law, "I think there's a reduced expectation of privacy in a borrowed vehicle. I think somebody who borrows a vehicle on an oral agreement has a reduced expectation . . . ." RP (Jan. 20, 2017) at 153; *see also* CP at 36 (Conclusion of Law 2.2).

The broad, general statement that all drivers of vehicles owned by a third party have a reduced expectation of privacy lacks support in controlling case law. For example, Vanhollebeke argues that *Randolph*, 547 U.S. 103—which held that a present, objecting co-tenant can override another tenant's consent to a search—bars

---

[11] *See* Suppl. Br. of Pet'r at 12 ("[I]t is entirely unknown whether Vanhollebeke provided consideration for borrowing the truck or whether his use was gratuitous, when and under what circumstances Vanhollebeke was required to return the truck to Casteel, or [if] anything else concerning the nature of the agreement between Vanhollebeke and Casteel . . . would provide a factual basis for ascertaining their interests and expectations relative to the truck.").

the search that occurred in this case. Pet. for Review at 4-7. *Randolph* held that under the "common authority" rule, the validity of third-party consent depends on the reasonable expectations of the parties involved. 547 U.S. at 111 ("The constant element in assessing Fourth Amendment reasonableness in consent cases, then, is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules.").[12] Vanhollebeke is certainly correct that under *Randolph*, when two people with common authority (like an owner and a lawful driver, perhaps of a leased or rented vehicle) disagree about whether to consent to a search, the refusal ordinarily trumps the consent, based on our "shared social expectation" of a lawful driver and a possessor's right to privacy. *See, e.g., United States v. Walker*, 237 F.3d 845, 849 (7th Cir. 2001); *United States v. Baker*, 221 F.3d 438, 442-43 (3d Cir. 2000).

Property law supports that general expectation. A driver may be using a vehicle based on a lease, a rental, a sharing arrangement, or some other agreement. Such a property right might also form the basis for an enforceable privacy right. As one concurring justice stated in *Fernandez v. California*,

> "[P]roperty rights 'are not the sole measure of Fourth Amendment violations.'" *Florida v. Jardines,* [569] U.S. [1], ——, 133 S. Ct. 1409,

---

[12] *See also Randolph*, 547 U.S. at 120-21 ("[T]he [cotenant's] 'right' to admit the police . . . is not an enduring and enforceable ownership right as understood by the private law of property, but is instead the authority recognized by customary social usage as having a substantial bearing on Fourth Amendment reasonableness in specific circumstances.").

1414, 185 L.Ed.2d 495 (2013). But as we have recently made clear, "[t]he *Katz* reasonable-expectations test 'has been *added to,* not *substituted for,*' the traditional property-based understanding of the Fourth Amendment." *Id.,* at ——, 133 S. Ct. at 1417 (quoting *United States v. Jones,* 565 U.S. [400, 409], 132 S. Ct. 945, . . . 181 L.Ed.2d 911 (2012)).

134 S. Ct. 1126, 1137, 188 L. Ed. 2d 25 (2014) (Scalia, J., concurring).

In coming to a different conclusion, the Court of Appeals relied on decisions from Georgia, Texas, and the Eighth Circuit that declined to extend the *Randolph* rule (of respecting the refusal of one with common authority, rather than the consent of another with common authority) to vehicles. The Court of Appeals came to that conclusion "because of society's lessened expectation of privacy in vehicles as compared to homes." *Vanhollebeke,* 197 Wn. App. at 75-76 (citing *United States v. Lumpkins,* 687 F.3d 1011, 1014 (8th Cir. 2012); *Sevilla-Carcamo v. State,* 335 Ga. App. 788, 795, 783 S.E.2d 150, *cert. denied,* No. S16C1041 (Ga. 2016); *State v. Copeland,* 399 S.W.3d 159, 156 (Tex. Crim. App. 2013), *aff'd,* 501 S.W.3d 610 (Tex. Crim. App. 2016). The court also cited two pre-*Randolph* cases approving of such searches—*Anderson v. United States,* 399 F.2d 753 (10th Cir. 1968) and *Hardy* (*see Vanhollebeke,* 197 Wn. App. at 73-74)—and the State adds one more in its briefing to this court: *United States v. Jensen,* 169 F.3d 1044 (7th Cir. 1999). Suppl. Br. of Resp't at 13-14.

14

We need not opine on the correctness of those factually distinguishable decisions. The key point is that we disagree with the Court of Appeals that these decisions support a broad, general rule that drivers assume the risk of an owner's consent to search. *Sevilla-Carcamo*,[13] *Anderson*,[14] *Jensen*,[15] and *Hardy*[16] all involve

---

[13] In *Sevilla-Carcamo*, police stopped a woman for failing to signal a turn, determined that she had no driver's license, placed her under arrest, and asked for consent to search the vehicle. 783 S.E.2d at 151-52. When she refused, the arresting officer allowed her to contact someone to take possession of the vehicle instead of allowing it to be impounded. *Id.* at 152. The woman contacted her pastor. *Id.* When he arrived, officers told him that they suspected that the vehicle contained contraband and that he would be responsible for anything they found inside. *Id.* The pastor then conferred with the driver, who told him (privately) that there might be drugs inside. *Id.* He requested that officers search the vehicle, and they did so. *Id.* The Court of Appeals approved this search, holding that when Sevilla-Carcamo entrusted her vehicle to her pastor she "creat[ed] a bailment" and assumed the risk that he would let someone else look inside. *Id.* at 155. The court also held that *Randolph* does not apply to vehicles. *Id.* at 155-56. It characterized *Randolph* as a "narrow holding" limited to the context of a residence. *Id.* at 155.

[14] *Anderson*, 399 F.2d at 754, 756-57 (after permissive driver was arrested for bank robbery, police later obtained owner's written consent to search car; search was valid because owner was either in possession or entitled to possession when she gave consent).

[15] *Jensen*, 169 F.3d at 1045, 1048-49 (after defendant was arrested in Illinois, officers contacted owner of car he was driving, who was in California; owner asked officers if they would impound the car to save him the cost of private towing and storage, and officers told him they could but would have to inventory the car to protect themselves; owner gave permission; meanwhile, arrested driver told another officer that he could not consent to the car's search because it wasn't his car; court held that defendant could not later complain that owner's consent was invalid; moreover, defendant assumed the risk that owner would consent when defendant "expressly acknowledged to the officers that [the owner] had the right and power to consent to a search").

[16] *Hardy*, 440 S.E.2d at 436-47 (after police informed car's owner that car could be impounded, owner consented to search over the objection of permissive driver, who had already been arrested; owner's consent overrode driver's objection because owner had absolute right to reclaim the vehicle at any time).

defendants who were already under arrest when officers obtained the third party's consent to the search. They cannot form the basis for a general rule that the driver of a vehicle owned by a third party ordinarily runs the risk that the third party will reclaim it and consent to a search. In addition, in this case, Vanhollebeke was not arrested, but rather lawfully detained and present to object to the search. RP (Jan. 20, 2015) at 30. *Copeland* involved a disagreement between a driver and passenger: the driver consented to the search and the passenger objected. 399 S.W.3d at 160.[17]

*Lumpkins* involved a defendant who supposedly lacked any possessory right to the vehicle at all—it was overdue for return to the company from which the defendant had rented it. 687 F.3d at 1012-14.[18]

---

[17] The Court of Appeals approved the search because it concluded that society generally recognizes the driver of a vehicle as having rights superior to a passenger's. *Copeland*, 399 S.W.3d at 164. That reasoning is not helpful here, where Vanhollebeke was the driver and Casteel, the car's true owner, was absent.

[18] In *Lumpkins*, officers followed a car with "heavily tinted windows" to a residence and, "out of concern for officer safety," handcuffed the driver when he emerged from the vehicle at a private residence. 687 F.3d at 1012. The officers looked through the car's windshield, also for purported safety reasons, and observed what looked like a bag of marijuana. *Id.* The keys were locked inside the car, which the officers soon learned had been rented by Budget Rent-a-Car to a third party who was present at the residence and objected to a search. *Id.* at 1012-13. The officers called the rental company and were told that the car was overdue for return. *Id.* at 1013. The rental company employee on the phone asked the officers to wait with the car until she could arrive to retrieve it. *Id.* When she arrived, she unlocked the vehicle remotely and consented to a search. *Id.* The officers searched the vehicle and recovered drugs, a handgun, and ammunition capable of penetrating bullet-proof vests. *Id.* The defendant, Lumpkins, argued that the search violated *Randolph*. *Lumpkins*, 687 F.3d at 1014. The Court of Appeals rejected that argument, noting that it is "not clear" whether *Randolph* applies to vehicles and holding

We therefore disagree with the State's and Court of Appeals' broad, general assertion that a driver of a vehicle owned by another person generally assumes the risk that the third-party owner will consent to a police search. *See Vanhollebeke*, 197 Wn. App. at 74 (stating "as bailee, Mr. Vanhollebeke had the actual right to exclude all others from the truck except for Mr. Casteel[, and] [f]or this reason, Mr. Vanhollebeke did not have a reasonable expectation of privacy if Mr. Casteel wanted to search his own truck or allow another person to do so"). Instead, leases, rental contracts, sharing arrangements, and other current societal expectations or property rights or agreements might bar such third-party consent searches. *See, e.g., Walker*, 237 F.3d at 849 ("A person listed as an approved driver on a rental agreement has an objective expectation of privacy in the vehicle due to his possessory and property interest in the vehicle."); *Baker*, 221 F.3d at 442-43 ("Although [defendant] did not own the car, he had substantial control over it insofar as he had borrowed it from a friend . . . had been driving it for four to six weeks . . . carried the keys to the car . . . [and there was] no evidence . . . that the car was stolen. . . . All of these factors lead to the conclusion that [defendant] had a reasonable expectation of privacy in the car.").

---

that, in any event, neither Lumpkins nor the renter had any right at all to a vehicle that they were on notice the rental company was trying to repossess. *Id.* at 1014.

> *D. The evidence in this case, however, gave the officers good reasons to believe the vehicle was stolen; this driver, without a key or identification and with a punched out ignition clearly visible, therefore assumed the risk that the police would contact the absent owner and seek consent to search*

We need not decide exactly when a driver's right to privacy in another's vehicle starts to fade away. We are faced with the much narrower issue of whether the driver of a vehicle he claimed he borrowed but that appears to be stolen—due to the punched out ignition and the driver's lack of a key, along with the driver's claim that he locked it in the vehicle when he exited contrary to the officer's command— assumes the risk that the police will contact the owner and that *owner* will consent to a police search. The answer to that question is clearly yes. This is consistent with the reasoning in the United States Supreme Court's "common authority" cases that "[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) ("A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.'"). The search in this case did not violate the Fourth Amendment.

Vanhollebeke argues that even if the Fourth Amendment does not prohibit the search that occurred in this case, article I, section 7 does. Suppl. Br. of Pet'r at 17-26. He is correct that article I, section 7 traditionally provides more robust protection of privacy rights and does not depend on the Fourth Amendment's reasonableness balancing.[19] But Vanhollebeke agrees that *Mathe* and the Fourth Amendment provide the two-question framework for analyzing whether the owner's consent can trump the driver's refusal. We therefore have no occasion to revisit the *Mathe* framework for analysis here.

## CONCLUSION

The driver of a vehicle generally has a right to refuse a police search of that vehicle. But that driver may assume the risk that the police will contact an absent owner and seek that owner's consent to search instead, in limited circumstances. Vanhollebeke assumed the risk that absent owner Casteel might consent to a search in this case. He did this by words, actions, and plain-view evidence, giving the police officers good reason to believe the truck might be stolen. We therefore affirm the Court of Appeals decision upholding denial of the motion to suppress.

---

[19] *State v. Morse*, 156 Wn.2d 1, 9-10, 123 P.3d 832 (2005) (noting "[u]nlike in the Fourth Amendment, the word 'reasonable' does not appear in any form in the text of article I, section 7 of the Washington Constitution. . . . We have also repeatedly held that article I, section 7 provides greater protection of individual privacy than the Fourth Amendment").

_Gordon McCloud, J._

WE CONCUR:

_Fairhurst, C.J._

_[signature]_

_Madsen, J._

_[signature]_

_Stephens, J._

_Wiggins, J._

_González, J._

_Yu, J._