STATE OF MAINE                      UNIFIED CRIMINAL COURT
CUMBERLAND, ss.                     LOCATION: PORTLAND
                                    DOCKET NOS. CUMCD-CR-18-359
                                    & CUMCD-CR-18-360

STATE OF MAINE                )
                              )
    v.                        )    ORDER ON DEFENDANTS' MOTIONS
                              )    TO SUPPRESS
JOSE FELICIANO &              )
MICHAELANGELO VELEZ,          )
            Defendants        )    Entered on the Docket: 0|5|19

## PROCEDURAL BACKGROUND

Defendants Jose Feliciano and Michaelangelo Velez are charged under

Title 17-A M.R.S. § 1107-A(1)(F)(3) with unlawful possession of a scheduled

drug (possession of over one pound to 20 pounds of marijuana). The

defendants separately filed motions to suppress evidence obtained during a

traffic stop and subsequent vehicle search that occurred on January 22, 2018.

The motions were heard by the Court on September 13, 2018. The defendants

appeared with counsel at the hearing. The State presented testimony from two

witnesses. Defendant Feliciano called one witness at the hearing. The Court

admitted Joint Exhibits 1 through 4 offered by the parties consisting of DVDs

of the audio and video recordings made on January 22, 2018, with equipment

in the police cruisers and on the persons of the State's witnesses present at the

roadside stop.[1] State's Exhibits 1 through 3 consisting of snapshot

---

[1] The recording on Joint Exhibit 1 was made by equipment in the cruiser of Trooper Patrick
Flanagan. It was 2:29:55 in length with a video feed from a single dashcam and audio from two
microphones, one in the cruiser cabin and the other on the person of the officer. The recording
began at 12:57:41 P.M., according to the time stamp. Joint Exhibit 2 was made by equipment

photographs taken from the video recordings were offered and admitted without objection.

Feliciano's motion to suppress was supported by a memorandum of law filed on April 4, 2018. As agreed and ordered by the Court after the hearing, both Feliciano and Velez filed memoranda of law on October 12, 2018, citing the evidence and stating their positions on the issues; the State filed a memorandum opposing both motions on November 2, 2018; and Feliciano filed a reply to the State's memorandum on November 9, 2018.

## FACTS

The following facts are based on testimony and documentary evidence admitted at the hearing including the audio and video recordings made by equipment in the police vehicles.

Maine State Police Trooper Patrick Flanagan was on patrol in his cruiser on I-295 in the afternoon on Monday, January 22, 2018. A mist was falling. The road surface was wet. The speed limit on the highway had been reduced to 45 MPH due to weather conditions. Shortly before 1:00 P.M., Flanagan heard a report of a silver Mitsubishi with New York license plates driving southbound on I-295 in Brunswick going very slowly in the passing lane and reportedly operated by a sleepy driver. Flanagan, traveling in the northbound lanes of the

---

in the cruiser of Trooper Jesse Duda. It was 1:03:31 in length with video feed from two dashcams and audio from microphones in the cabin and on the trooper's person. The time stamp indicated that this recording began at 2:21:15 P.M. on the same date. Joint Exhibit 3, also made by equipment in Duda's cruiser, was 1:08:23 in length with video and audio from the same dashcams and microphones as Joint Exhibit 2. This recording began at 1:12:54 P.M. on the same date. Joint Exhibit 4, also from Duda's cruiser, was 00:11:52 in length and began at 4:20:38 P.M. Joint Exhibit 1 did not display running time stamp information while being played. The other recordings showed time stamps during play.

highway, spotted the vehicle in question as it came toward him going in the opposite direction. He observed that the windshield wipers were on but the headlights were off in violation of Title 29-A M.R.S. § 2067(1). He also observed that the vehicle was going 73 MPH in an area where the speed limit was normally 65 MPH. He activated his blue emergency lights and crossed over the median to reverse his direction. When Flanagan caught up to the vehicle, he saw activity in the rear seat area that he described as furtive movement. Responding to the blue lights, the vehicle pulled over to the side of the highway in Falmouth at 1:04 P.M.

Flanagan approached the vehicle on the passenger side. He saw that there were three people in it, all young males; the driver, a passenger in the front, and a passenger in the rear who appeared to have been lying down on the back seat before the stop. Flanagan asked the driver if he knew why he was being stopped. When the driver answered no, Flanagan told him that he was being stopped for going 73 MPH in a 65 MPH zone and for failing to have the headlights on while using the windshield wipers as required under Maine law. He asked for the vehicle registration and identification from all three occupants. The driver produced a New York driver's license identifying him as defendant Jose Feliciano.[2] The passenger in front produced a New York identification card indicating that he was defendant Michaelangelo Velez. The passenger in the back seat had no identification document. He stated that his

[2] The license produced by Feliciano mistakenly identified him as "Jose *Felicano*" as the result of a typographical error by the licensing agency in New York. This discrepancy was explained later by Feliciano's father and is not material to the suppression motions.

name was Matthew Rodriquez and, at Flanagan's request, wrote down his name, date of birth, and social security number on a piece of paper. Flanagan also asked them where they had started their trip. Feliciano stated that they were driving back to New York from Farmingdale, Maine, where they had been visiting his cousins. The behavior of the occupants seemed odd to Flanagan. The two passengers were inattentive and slow to react. They also giggled inappropriately and appeared to be nervous. Flanagan thought that they were either high or very tired.

The initial conversation with the vehicle occupants lasted for about five minutes. Flanagan returned to his cruiser to run the license plate and records check on all three occupants. Using the radio, he requested assistance from another trooper with a drug-sniffing dog. He determined that Feliciano's license was active. He was unable to confirm the identity of the passenger in the back seat based on the name, date of birth, and social security number provided.

Flanagan went back to the car and told them that he was unable to find a record corresponding to the information provided by the back seat passenger. He asked this person to confirm his full name and date of birth. He also asked the occupants if they were high or had ever been involved with drugs. They answered in the negative although one of the occupants stated that he used to smoke marijuana. This conversation lasted for about three minutes.

Suspecting that "Matthew E. Rodriguez," the name given by the back seat passenger, was false, Flanagan returned to his cruiser at about 1:15 P.M. to continue to search for it. After several minutes, he went back to the

4

Mitsubishi and explained that the stop was continuing because he was unable to find a record confirming the identity of "Rodriguez." Flanagan asked "Rodriguez" if he had been lying down in the back seat when Flanagan pulled them over. He also told the occupants that he had seen a lot of movement in the rear seat area when he stopped them. The back seat passenger assured him that "Rodriguez" was his real name.

At that time, about fifteen minutes after the stop began, Maine State Police Trooper Jesse Duda arrived on the scene accompanied by his drug-detecting dog.[3] Duda had six years of experience as a trooper in the Maine State Police and five years with the Kennebec County Sheriff's Department. He parked his cruiser behind Flanagan's car. After a brief conversation with Flanagan, he led his dog through a sniff protocol, circling the Mitsubishi twice while the occupants waited inside the vehicle with their hands in sight of the officers. The dog was trained to detect the presence of cocaine, methamphetamine, crack, and heroin, and was not trained to detect marijuana. It did not indicate that there were any drugs in the defendants' car. During the sniff, which took about five minutes, Feliciano made noises that seemed to Duda to be intended to distract the dog. Duda believed that the front seat passenger, Velez, was very nervous because he stared straight ahead and avoided eye contact and the carotid artery in his neck was visibly pulsating.

---

[3] A third officer was also present on the scene at that time. This officer was not called to testify at the suppression hearing.

5

When Duda spoke with him through the open passenger side window, he denied being nervous.

While Duda was talking with Velez through the open car window, about twenty minutes after Flanagan initiated the stop, he noted a strong odor of fresh marijuana coming from the back seat area of the vehicle. He then asked Feliciano to get out of the car and told Flanagan about the odor. Flanagan returned to the Mitsubishi to smell the odor. He agreed that it was a strong odor of fresh marijuana coming from inside the rear area of the car.

Outside the car and out of earshot of the two passengers, Duda questioned Feliciano about his whereabouts during the trip to Maine. Feliciano told him that they had been visiting his cousins and his aunt Gloria in Farmingdale since Friday, they had no drugs in the car, and the only occupant who smoked marijuana was his cousin Matthew, the back seat passenger.

Duda returned to the Mitsubishi to talk with the other two occupants. The back seat passenger said they were visiting his uncle Mark in Farmingdale. He said that they had attended the funeral of Mark's daughter, who had committed suicide.

Returning to speak with Feliciano outside the car, Duda asked him what they did while they were visiting. Feliciano replied that they watched a movie. He did not mention a funeral and said that the trip was not related to any recent events in the family. Duda then asked Velez and the back seat passenger to exit the vehicle and patted them down.

At this time, after about twenty-five minutes by the side of the road, Flanagan was informed through the records check that Velez was on bail related to charges in New York including felony drug possession with intent to sell, possession of marijuana, and obstructing government administration. Flanagan questioned Velez about the newly-received information because it was inconsistent with his statement that he was not involved with drugs. Velez admitted that he had been arrested and had a court date. He offered in his defense that the charges stemmed from activity in Las Vegas that was not recent and that he was confident that he would be exonerated.

At 1:30 P.M., Duda spoke with Feliciano. He said that the stories given by Feliciano and the other occupants of the car were far apart. He said that, in his experience, people he stopped usually knew where they were coming from and what they had been doing there. He told Feliciano that, as a result of the inconsistencies, he did not believe that they were telling the truth and suspected criminal activity. Duda then asked Feliciano for consent to search the car. Feliciano answered, "I don't consent to a search. I already let the dog sniff the car." Duda again asked Feliciano if he would consent to a search of the car. Feliciano said, "I don't think I want to, man. I think I want to continue on my way." This conversation occurred at 1:33 P.M. about a half-hour after Flanagan initially stopped the car.

At 1:34 P.M., Duda asked for and received consent from the three men to have the dog sniff their persons outside the car. The dog gave no indication of the presence of the drugs he was trained to detect. A few minutes later,

7

"Rodriguez" changed his previous answer to Flanagan's question about marijuana use and admitted that he smoked sometimes but he stated again that there was no marijuana in the car.

At 1:36 P.M., while Duda was preparing his dog for the sniff, Flanagan also asked Feliciano if he would consent to a search of the car. Feliciano again declined, stating, "I told [Duda] I don't really consent to [a search]." Flanagan said, "have you guys got something to hide ... because if you have nothing to hide (inaudible) ...?" Feliciano replied, "... now you are trying to pressure me into giving up my rights." During this exchange, Flanagan observed that Feliciano gulped, avoided eye contact, and seemed to become defensive. He appeared to Flanagan to be very nervous.

At 1:47, Duda and Flanagan, standing near Flanagan's cruiser, discussed the situation. Duda stated that he thought there was enough evidence to obtain a warrant. At that point, one of the officers called out to the back seat passenger who was standing by the roadside next to the Mitsubishi, addressing him as "Rodriguez." He did not respond or acknowledge being addressed. He responded only after Flanagan repeated the name loudly with the first name "Matthew."[4] The officers took this lack of response as further confirmation that the name he had given them was false. As part of the continuing effort to identify this person, Duda took a photograph of the passenger with his phone.

---

[4] It was later determined that the first name "Matthew" in fact was correct. The last name "Rodriguez" was false.

At 2:00 P.M., Duda asked Feliciano for the name of the owner of the car. Feliciano replied that it was his stepmother Anna's. He acknowledged that it was not registered to him. He did not have her telephone number. He gave Duda the number for his father, Jose Feliciano, Sr.

At 2:07 P.M., Duda telephoned Jose Feliciano, Sr., to ask about Feliciano's use of the car and check Feliciano's statements about the purpose of the trip to Maine and related information. Feliciano's father said that he had given the car to his son as a graduation present. He said that his son had authority to use the car although it was registered to Anna Wojewnik, his wife and Feliciano's stepmother. He told Duda that Feliciano's use of the car was "legit." Duda asked him if he was aware that his son was in Maine with the car. He said that he was not. Duda asked him if he knew of any relatives in Maine that his son would be visiting. He said there were none that he was aware of, although he could not be sure about Feliciano's mother's family.

Duda confronted Feliciano with the inconsistencies between the information provided by his father and the statements previously made to Flanagan and Duda by the three occupants. Feliciano did not have an explanation.

At about 2:15 P.M., while Flanagan continued his efforts to verify the identity of the back seat passenger, Duda told Feliciano that the car would probably be towed while the police obtained a warrant, a process that could take two hours. Duda told Feliciano that he and the other occupants could choose to wait around in the meantime or they could catch a bus home to New

9

York and come back later. Feliciano stated that he wanted to wait to see what happened. At this point also, in answer to a question asked by Flanagan, "Rodriguez" confirmed that he had not been wearing his seatbelt when the car was pulled over. Flanagan then advised him that he would be cited for this violation.

At 2:20, Duda stated to Feliciano that the car would be towed and held while the officers obtained a search warrant. He also repeated that Feliciano and the other occupants of the car could catch a bus home to New York if they wanted or they could wait in a gas station or coffee shop for the process to be complete. Duda stated that the three men would be provided with transportation from the scene of the stop to a gas station or coffee shop off the highway.[5]

The wrecker arrived on the scene about a half-hour later at 2:55 P.M. to tow the car to the impound lot. Feliciano and the back seat passenger, given the option of going with the car, rode in the cab of the wrecker as far as the police barracks where they were dropped off by the driver before he continued with the car to the impound lot. Velez rode to the barracks in the back seat of

---

[5] The evidence is clear that the police told the defendants at 2:15 P.M. that they were free to go back to New York or elsewhere to wait while a search warrant for the car was obtained and executed. Although Velez argued that the relevant time period for assessing the length of the detention was 2½ hours, encompassing the entire period of time from the initiation of the roadside stop by Flanagan through the defendants' arrival at the police barracks at around 3:30 P.M., the court finds that this statement by the officers effectively ended the detention of the defendants. The defendants' continued presence on the scene resulted from their decisions to remain with the car during the warrant and search process. Testimony elicited at the hearing about the possible responses of the officers to any efforts by the defendants to leave the scene at that point was mere speculation and addressed the subjective intentions of the officers which are not involved in Fourth Amendment analysis. *See, Whren v. U.S.*, 517 U.S. 806, 813 (1996).

Duda's cruiser.[6] After conversations with the officers in the parking lot at the barracks, the three men walked to a gas station nearby to wait while the officers obtained a warrant and searched the car. Throughout the stop, the three occupants of the car had their cell phones and used them from time to time. The police did not take away the phones or restrict the ability of the defendants to use them.[7]

Flanagan and Duda testified that they discussed the situation while they were at the barracks. They believed that the process of obtaining a warrant was likely to take several hours and possibly until the next day. They decided to contact the owner, who was identified as Anna Wojewnik, and ask her if she would consent to a search of the vehicle. They drove to the impound lot and, while they were there, spoke with her by telephone. The officers' testimony at the hearing, supported by the recording made by Duda's wireless microphone and dashcam, showed that Duda asked Wojewnik if it was okay to search the car. Her answer was, "You gotta do what you gotta do." Duda told her that he would keep her on the speakerphone while the search was conducted and she could tell the officers to stop the search at any point. The troopers then searched the car. Wojewnik did not instruct them to stop the search at any

---

[6] During the period of time when he was in Duda's car and Duda was driving him from the scene of the roadside stop to the barracks, Velez was in handcuffs for security at the request of the officer. The handcuffs were removed when they arrived at the barracks parking lot.
[7] While Duda was calling a number given by the back seat passenger, in an effort to speak with his mother and have her confirm his identity, Duda instructed the defendants not to use their phones for a minute so that he could be sure that they were not coaching the call recipient by text-messaging her.

11

time. At 4:27 P.M., Duda found a trash bag in the trunk of the car containing a quantity of marijuana later determined to weigh in excess of five pounds.

The troopers went to the gas station where the defendants were waiting. They confronted the three occupants of the car separately with the results of the search and asked each one if he knew about the marijuana. All three denied any knowledge. They were then arrested.

## DISCUSSION

### 1. Prolonged Detention

The core contention of both defendants is that the roadside stop of the vehicle was prolonged unreasonably and was therefore a violation of the prohibition against unreasonable seizures.[8] As a result, they argue, the evidence gathered during and after the stop should be suppressed. Feliciano argues also that the search of the vehicle was a violation of the prohibition against unreasonable searches because the police did not have probable cause, valid consent, or a warrant.[9]

The U.S. Supreme Court has analogized roadside questioning during a traffic stop to a *Terry* stop, which allows an officer with reasonable suspicion to detain an individual in order to ask a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling

---

[8] Neither defendant developed an argument that the stop made by Flanagan violated the prohibition against unreasonable seizures on the grounds that it was pretextual. They therefore conceded that the stop was initially justified.

[9] Velez argued that the marijuana should suppressed as the "fruit of the poisonous tree" on the basis that the stop was unreasonably prolonged and therefore a violation of the Fourth Amendment. The State disagreed and briefed its position on the applicability of this judicial doctrine. Because the Court concludes that the stop was not unreasonably prolonged, it is unnecessary to address this argument.

12

the officer's suspicions. *United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). A constitutionally permissible traffic stop can become unlawful, however, "if it is prolonged beyond the time reasonably required to complete" its purpose. *U.S. v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). During a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation. *Id.* A reasonable investigation includes asking for the driver's license and the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose. *U.S. v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005). Whether a particular detention is reasonable in length is a fact-intensive question, and there is no *per se* time limit on all traffic stops. *U.S. v. Olivera-Mendez*, 484 F.3d 507, 510 (8th Cir. 2007); *U.S. v. Place*, 462 U.S. 696, 709-10 (1983) (no specific time period beyond which a traffic stop that was initiated with proper justification becomes unreasonable *per se*); *see also, U.S. v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (no "talismanic time" beyond which investigative stop becomes unreasonable). In making this determination, "common sense and ordinary human experience must govern over rigid criteria." *U.S. v. Sharpe*, 470 U.S. 675, 685 (1985). The question is whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. *Id.* at 686. When there are complications in carrying out the traffic-related purposes of the stop, police may

13

reasonably detain a driver for a longer duration than when a stop is strictly routine. *Id.* "Reasonableness is measured in objective terms by examining the totality of the circumstances." *United States v. $ 404,905.00 in U.S. Currency,* 182 F.3d 643, 646 (8th Cir. 1999) (quoting *Ohio v. Robinette,* 519 U.S. 33, 39 (1996)).

The police made the stop in this case based on two apparent traffic violations: the vehicle was exceeding the speed limit and the headlights were not illuminated while the wipers were in constant use. After making the stop, the police confirmed their suspicion that the back seat passenger had not been wearing a seatbelt, which was another violation subjecting the occupant to a possible citation. This passenger gave the police a false name. Inquiry into a passenger's identity during a traffic stop is permissible and does not unreasonably extend the stop when the police have reason to believe that the person is giving a false name and might be involved in criminal activity. *U.S. v. Fernandez,* 600 F.3d 56, 62 at fn. 5 (1st Cir. 2010). Under the circumstances, the occupants should reasonably have expected that this routine process would be problematic for the police and result in prolonging the stop.

While the process of verifying the passenger's identity was underway, the second officer arrived on the scene with his police dog for the purpose of conducting a routine drug sniff. During the walk around the car with the dog, this officer detected a strong odor of fresh marijuana coming from inside the car. It was also during the delay occasioned by the false name that the officers discovered obvious and unexplained discrepancies between the occupants'

14

versions of the facts of their trip to Maine. Within twenty-five minutes after the car was stopped, the police became aware of the passenger identity problem, the defendants' palpably false stories, and the strong odor of fresh marijuana.

The defendants note correctly that Flanagan hesitated to act on the information that he and the other officers on the scene gathered within the first half hour of the stop. From approximately 1:30 P.M., when they knew about the odor, the false name, and the fabricated stories, until about 2:15 P.M., when they acted to seize the car, it appears that the officers gathered little information relevant to the original purpose of the stop. The officers did not question Feliciano about ownership of the car until shortly before 2:00 P.M., approximately one hour after the stop was initiated. They called and spoke with Feliciano's father. While the information he provided confirmed the officers' suspicions that the occupants' stories about where they had been and the purpose of the trip were, in fact, false, the officers already knew that the stories were inconsistent and dubious. It appears from the record that it took the officers more than a half hour to make the decision to call the tow truck and take the car to the impound lot during which they learned nothing new of importance to the decision. Even then, the officers were planning to obtain a warrant and did not make the decision to conduct the search without a warrant until later, after the car was in the impound lot. In the defendants' view, the stop should have ended around 1:25 P.M., after a detention of about 25 minutes, when the police had the information necessary to issue a citation to Feliciano. After that point, the defendants argue, the detention became

15

unreasonably prolonged and was an impermissible "fishing expedition" under the Fourth Amendment.

The defect in the defendants' argument is its failure to take into account the problem of the identity of the back seat passenger and the officers' reasonably diligent and continuing efforts to resolve it. They checked and rechecked the resources available to them using the information that was falsely and repeatedly furnished by this passenger. They conversed with him, as well as the two defendants, frequently during this period and asked appropriate questions to determine why it was proving impossible to confirm his identity as he represented it to them. They elicited his cooperation by asking about family members they could contact by telephone to confirm his identity. They even tried to use his social media accounts to match the name he was furnishing with a photograph on the internet. The defendants knew that these efforts were futile and essentially a waste of time. It is significant that the defendants did not cooperate with the officers by correctly identifying the back seat passenger, who was possibly a cousin and at least a friend. They did not deny knowing him. They went along passively with his ruse at all times. At one point, they both actively affirmed the false name. In effect, the defendants participated in the obfuscation of the investigation and caused the prolongation of the stop. As a result, the true identity of the back seat passenger was not revealed until much later, after all three occupants of the car had been arrested and taken to the jail.

16

At best, it would be anomalous under Fourth Amendment jurisprudence to reward the defendants for helping the passenger, who was subject to citation for an admitted violation of the seat belt law, to falsify his identity by finding that the additional time needed to investigate the fake name he provided converted a legitimate traffic stop into an unreasonable seizure justifying suppression of the resulting evidence. In this respect, the relevant circumstances differ significantly from those in *U.S. v. Henderson*, 463 F3d. 27 (1st Cir. 2006), cited by the defendants. First, the court in *Henderson* found the arresting officer's testimony to be false in reference to the seat belt configuration in the car and the defendant's failure to use it. *Id.* at 33. Therefore, the defendant was not subject to citation for a seat belt violation, Second, the defendant in *Henderson* provided correct identification information to the officer upon request. Therefore, the delay was not attributable to dissembling statements made to the officer by the defendant. In the instant case, the back seat passenger acknowledged to the officers on the scene that he was not wearing a seat belt and provided false identification information to the officers.

Under these circumstances, the officers' conduct was reasonable as the events unfolded at the scene of the stop and the scope of the investigation increased to include the problem with identification of passenger subject to summons for the seat belt violation and other possible criminal activity. *See*, *U.S. v. Orth*, 873 F.3d 349, 354 (1st Cir. 2017) ("circumstances and unfolding events during a traffic stop allow for an officer to 'shift his focus and increase

17

the scope of his investigation'"); *U.S. v. Fernandez, supra* p. 14, at 62 (holding that no Fourth Amendment violation occurred when an officer sought identification of a passenger in order to issue a seat belt citation). The length of the stop was not unreasonable considering the totality of the circumstances. *See, U.S. v. Owens,* 167 F.3d 739, 749 (1st Cir. 1999) (traffic stop with detention of fifty minutes lengthy but not unreasonable); *U.S. v. Garcia-Zavala,* 2018 U.S. Dist. LEXIS 32504 (dec'd Feb. 28, 2018) (time needed to verify identity of passengers is "negligibly burdensome precaution"); *U.S. v. Chaney,* 584 F.3d 20, 26 (1st Cir. 2009) (delay warranted by reasonable suspicion that name given by defendant was false based on defendant's implausible answers and nervous demeanor during traffic stop); *see also, U.S. v. Sharpe,* 470 U.S. 675, 688 (1985) (delay not unreasonable when actions of vehicle's occupants contributed to prolongation of detention). Accordingly, the Court finds that the detention of the defendants for approximately seventy-five minutes did not violate their rights under the Fourth Amendment.

2. Search Without Feliciano's Consent

Feliciano argues that the search of the vehicle made in the impound lot was invalid because he was in lawful possession of the vehicle, he explicitly refused to consent to the search when asked at two different times by two different officers, and the police did not have probable cause to seize the car and search it. In his view, the consent to the search that the police obtained from Anna Wojewnik, the registered owner of the car, did not "override" or cancel out his reasonable expectation of privacy as the rightful possessor and

18

user of the vehicle and her consent did not vitiate his refusal to consent which was clearly and repeatedly communicated to Flanagan and Duda at the scene of the stop.[10] Because the Court finds that the police had probable cause at the time when they conducted the search, it is unnecessary to address Feliciano's argument on the issue of consent.

"Pursuant to the automobile exception, the existence of probable cause justifies a warrantless seizure and reasonable search of a motor vehicle irrespective of the existence of exigent circumstances. Probable cause exists when the officers' personal knowledge of facts and circumstances, in combination with any reasonably trustworthy information conveyed to them, would warrant a prudent person to believe that the area to be searched holds evidence of a crime." *State v. Melvin*, 2008 ME 118, ¶ 15, 955 A.2d 245, 250 (citations omitted); *see also, State v. Michael M.*, 2001 ME 92, ¶ 6, 772 A.2d 1179, 1182 ("[p]robable cause to search exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place").

When they searched the vehicle in the impound lot at 4:30 P.M., the officers had a number of items of information available to them supporting the conclusion that it would contain evidence of a crime. Duda, an officer with a number of years of experience in drug enforcement, detected the strong odor of

---

[10] Although he characterized the consent the police obtained from Wojewnik, the registered owner of the car, as "tepid at best," Feliciano did not develop the argument that it was coerced or otherwise defective. He argued only that her consent was ineffective under the circumstances because it was 'trumped' by his refusal to consent, a proposition which is not facially untenable under the law. *See, e.g., State of Washington v. Vanhollebeke*, 412 P.3d 1274, 1279 (S. Ct. of Wa. 2012) (driver of a car does not ordinarily assume the risk that owner will consent to search).

fresh, unburned marijuana emanating from the back seat area of the car. The officers knew that the defendants gave inconsistent answers to questions about the timing of their trip, their whereabouts over the weekend, and their activities while in the State. They also knew that the answers were outright falsehoods in several respects. The defendants were visibly nervous. They shifted their gazes and avoided eye contact. Feliciano gulped when asked about a search of the vehicle. Velez had a criminal history involving drug offenses and, during the dog sniff, his carotid artery was visibly pulsating. Feliciano's father, with whom he resided, did not know that Feliciano was in Maine or why he was there. The third occupant of the car had given a false name from the beginning, indicating that he was evading identification for some reason. Despite the fact that the officers told him, as well as the defendants, that they knew it was a false name, he maintained that it was his correct name. The defendants were both participating in this ruse at all times during and after the stop. Feliciano at one point said the passenger's name was "Ramirez" but, with prompting by Velez, quickly attempted to rectify this inadvertent slip. All of these factors accumulated to result in a high level of furtive and suspicious behavior which, combined with the odor detected by Duda, gave rise to probable cause justifying the warrantless search of the trunk. *See, State v. Ireland*, 1998 ME 35, ¶ 12, 706 A.2d 597, 601 (probable cause supported by marijuana smell plus furtive behavior of occupant). Therefore, the search of the car was not a violation of the constitutional protections against unreasonable searches and seizures.

20

## CONCLUSION

Defendant Feliciano's motion to suppress evidence gathered as a result of the traffic stop and search of the motor vehicle is denied.

Defendant Velez's motion to suppress statements and physical evidence obtained after the traffic stop is denied.

DATE: _____, 2019

Roland A. Cole
Chief Justice, Superior Court

21

STATE OF MAINE
vs
MICHAELANGELO VELEZ
85B VISITATION PLACE
BROOKLYN NY 11207

CRIMINAL DOCKET
CUMBERLAND, ss.
Docket No    CUMCD-CR-2018-00360

**DOCKET RECORD**

DOB: 03/07/1991
Attorney:    WILLIAM MASELLI                          State's Attorney:    STEPHANIE ANDERSON
             LAW OFFICE OF WILLIAM MASELLI
             39 PORTLAND PIER
             PORTLAND ME 04101
             APPOINTED 01/24/2018

Filing Document:    CRIMINAL COMPLAINT                 Major Case Type:  FELONY (CLASS A,B,C)
Filing Date:        01/24/2018

Charge(s)

1    UNLAWFUL POSSESSION OF SCHEDULED DRUG                    01/22/2018    FALMOUTH
Seq 11499          17-A  1107-A(1)(F)(3)       Class C
FLANAGAN                              /    MSP

Docket Events:

01/24/2018 FILING DOCUMENT - CRIMINAL COMPLAINT FILED ON 01/24/2018

01/24/2018 Charge(s):  1
           HEARING - INITIAL APPEARANCE SCHEDULED FOR 01/24/2018 at 01:00 p.m. in Room No.  1

           NOTICE TO PARTIES/COUNSEL
01/26/2018 Charge(s):  1
           HEARING - INITIAL APPEARANCE HELD ON 01/24/2018
           NANCY  MILLS , JUSTICE
           DA:  STEPHANIE ANDERSON
           Defendant Present in Court
           FTR1
01/26/2018 Charge(s):  1
           HEARING - DISPOSITIONAL CONFERENCE SCHEDULED FOR 04/03/2018 at 10:00 a.m. in Room No.  7

01/26/2018 Charge(s):  1
           TRIAL - JURY TRIAL SCHEDULED FOR 06/11/2018 at 08:30 a.m. in Room No.  11

           NOTICE TO PARTIES/COUNSEL
01/26/2018 BAIL BOND - $3,500.00 CASH BAIL BOND SET BY COURT ON 01/24/2018
           NANCY  MILLS , JUSTICE
01/26/2018 MOTION - MOTION FOR APPOINTMENT OF CNSL GRANTED ON 01/24/2018
           NANCY  MILLS , JUSTICE
           COPY TO PARTIES/COUNSEL
01/26/2018 Party(s):    MICHAELANGELO VELEZ
           ATTORNEY - APPOINTED ORDERED ON 01/24/2018

           Attorney: WILLIAM MASELLI
02/06/2018 BAIL BOND - $3,500.00 CASH BAIL BOND FILED ON 02/05/2018

           Bail Receipt Type:  CR
           Bail Amt:  $3,500
           Receipt Type:  CK
           Date Bailed:   02/01/2018        Prvdr Name:   MICHAELANGELO VELEZ
                                            Rtrn Name:    MICHAELANGELO VELEZ
           1069
04/03/2018 Charge(s):  1